No. 24,539.

THE KANSAS WHEAT GROWERS ASSOCIATION, *Appellant*, v. FRANK SCHULTE, *Appellee*.

SYLLABUS BY THE COURT.

1. WHEAT GROWERS ASSOCIATION—*Not an Unreasonable Combination in Restraint of Trade—Not an Unlawful Monopoly.* A nonprofit coöperative association, organized under chapter 148 of the Laws of 1921, for the marketing of agricultural products raised by its members, is not an unreasonable combination in restraint of trade, neither does it create an unlawful monopoly in the sale of such products.

2. SAME—*Duty of Member to Deliver His Wheat to the Association.* A member of such an association is not justified in refusing to deliver his wheat to the association because he cannot learn at the time of delivery the price he will receive for his wheat.

3. SAME—*Injunction—Association Entitled to Temporary Restraining Order.* The provisions of section 16, of chapter 148, of the Laws of 1921, pertaining to a suit by a coöperative marketing association organized under the statute, against one of its members for failure to deliver his crop to the association in accordance with his contract with it, and providing, "Pending the adjudication of such an action and upon filing a verified complaint [or petition] showing a breach or threatened breach, . . . the association shall be entitled to a temporary restraining order and preliminary injunction against the member," is not void for the reason that it deprives a court of equity of its judicial discretion in the granting of temporary injunctions, but it is, so far as can be, a legislative determination of the rights of the parties and establishes a rule of procedure to guide the court in passing upon the application for the writ.

4. SAME—*Language of Statute Liberally Construed.* In such a case, the general rule that the language of the statute will be liberally construed for the purpose of upholding and promoting its object, and that strained and technical interpretations of its provisions for the purpose of impairing and defeating its manifest purpose will be avoided, is applicable. And when a fairly reasonable showing has been made the association is entitled to a temporary injunction upon giving a proper bond.

5. SAME—*No Adequate Remedy at Law.* In such a case, there is no adequate remedy at law.

6. INJUNCTION——*Verified Petition—When Sufficient to Authorize Issuance of Writ.* In such a case, in order for the verified petition used as an affidavit to be sufficient to authorize the issuance of the injunction, it must contain averments and recitals of fact sufficient to constitute a showing that the association is entitled to the writ.

7. SAME—*Petition Construed—Evidence.* The record examined, and *held,* (1) that plaintiff's petition was insufficient to make the necessary showing, and (2), that upon the showing made at the hearing the temporary injunction should have been granted.

Appeal from Sedgwick district court, division No. 3; JESSE D. WALL, judge. Opinion filed June 9, 1923. Reversed.

*T. A. Noftzger, George W. Cox, Benjamin F. Hegler, W. J. Masemore,* and *R. L. NeSmith,* all of Wichita, for the appellant.

*J. A. Brubacher, W. D. Jochems,* and *J. Wirth Sargent,* all of Wichita, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is a suit for an injunction by the Kansas Wheat Growers Association against one of its members. A restraining order was issued upon the filing of plaintiff's verified petition. Upon the hearing for a temporary injunction, evidence was presented, and the injunction denied. From this ruling the plaintiff has appealed.

The Kansas Wheat Growers Association is a coöperative association organized not for profit and without capital stock. Its incorporation is authorized by chapter 148 of the Laws of 1921. The statute states the purpose of such corporations as follows:

"In order to promote, foster, and encourage the intelligent and orderly marketing of agricultural products through coöperation and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problems of agricultural products, this act is passed." (§ 1.)

The act provides, that twenty or more persons engaged in the production of agricultural products may form an association to engage in any activity in connection with the marketing of the agricultural products of its members. Under the terms and .conditions of its by-laws, the association may admit as members persons engaged in the production of agricultural products only, including

43—113 KAN.

lessees and lessors who receive part of the crop as rent. The statute provides the terms of the articles of incorporation and for amendments to the charter, and requires each association within thirty days after its incorporation to adopt by-laws not inconsistent with the statute, and sets out what some of the by-laws must be. The affairs of the association are to be managed by a board of directors who may be chosen by districts, and their election, and also the election of the officers of the association, is provided for. Section 16 of the statute reads as follows:

"The association and its members may make and execute marketing contracts, requiring the members to sell, for any period of time, not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association or any facilities to be created by the association. The contract may provide that the association may sell or resell the products of its members, with or without taking title thereto; and pay over to its members the resale price, after deducting all necessary selling, overhead and other costs and expenses, and other proper reserves; and interest not exceeding eight per cent per annum upon common stock. The by-laws and the marketing contract may fix, as liquidated damages, specific sums to be paid by the member or stockholder to the association upon the breach by him of any provision of the marketing contract regarding the sale or delivery or withholding the products; and may further provide that the member will pay all costs, premiums for bonds, expenses and fees in case any action is brought upon the contract by the association; and any such provision shall be valid and enforceable in the courts of this state. In the event of any such breach or threatened breach of such marketing contract by a member, the association shall be entitled to an injunction to prevent the further breach of the contract, and to a decree of specific performance thereof. Pending the adjudication of such an action and upon filing a verified complaint showing the breach or threatened breach, and upon filing a sufficient bond, the association shall be entitled to a temporary restraining order and preliminary injunction against the member."

Other provisions of the statute need not be specially noted. It is sufficient to say that the statute is an enabling act authorizing the incorporation of coöperative associations among producers of agricultural products for the best interest of the membership of the association and without profit to the association itself.

This plaintiff was organized as a nonprofit coöperative association under the provisions of the statute referred to for the purpose of marketing wheat, and adopted by-laws in harmony with the statute. The by-laws provided, among other things, for the creation and maintenance, in each district and central localities, of informal local branches of the association, which should have their own

Wheat Growers Association v. Schulte.

officers, who may attend meetings of the board of directors and act in an advisory capacity. There is an application for membership to be signed by the members, which recites that the applicant has read the articles of incorporation, by-laws, and association agreement, and standard marketing agreement of the association, understands and accepts them as binding upon him in all their terms, and by which he agrees to perform all the obligations of the by-laws and marketing agreement. There was also a separate marketing agreement by which the member agreed to sell and deliver to the association all the wheat produced by or for him, or acquired by or for him, as landlord or lessee, during the years 1921, 1922, 1923, 1924 and 1925, except such as he might retain for seed to be sown by himself or to be sold for seed direct to wheat growers. The marketing agreement contains many provisions in accordance with the general plan of the organization, and provides that the agreement is one of a series, generally similar in terms, comprising, with all such agreements signed by individual growers, one single contract between the association and the growers, mutually and individually, obligated under all the terms thereof, and contains these provisions:

"(a) Inasmuch as the remedy at law would be inadequate; and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the association, should the grower fail so to sell and deliver all of his wheat; the grower hereby agrees to pay to the association for all wheat delivered, sold, consigned, withheld or marketed by or for him, other than in accordance with the terms thereof, the sum of twenty-five cents per bushel, as liquidated damages for the breach of this contract, all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all of the growers to each and all of the said contracts.

"(b) The grower agrees that in the event of a breach or threatened breach by him of any provision regarding delivery of wheat the association shall be entitled to an injunction to prevent breach or further breach hereof and to a decree for specific performance hereof and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions and that the buyer cannot go to the open markets and buy wheat to replace any which the grower may fail to deliver.

"(c) If the association brings any action whatsoever, by reason of a breach or threatened breach hereof, the grower agrees to pay to the association all costs of court, costs for bonds and otherwise, expenses of travel and all expenses arising out of or caused by the litigation and any reasonable attorney's fees expended or incurred by it in such proceedings, and all such costs and expenses shall be included in the judgment and shall be entitled to the benefit of any lien securing any payment thereunder."

Plaintiff's petition set up its incorporation under the statute above cited and the adoption of its by-laws, and that the defendant had become a member of the association by signing the application for membership, paying the fee therefor, and by signing the marketing agreement, and that his membership had been approved by the officers of the association, copies of which by-laws, application for membership and marketing agreement were made a part of the petition. The petition further alleged that defendant had on hand wheat which he had produced in the crop of 1922, and alleged that defendant had breached and violated the agreement, in that he had sold and delivered about a thousand bushels of his wheat to parties other than the plaintiff; that by reason of the breach of the contract plaintiff had been damaged by defendant, and that defendant is indebted to plaintiff for 25 cents per bushel for all the wheat so sold by him, as liquidated damages; and further alleged that defendant had on hand a large quantity of wheat produced by him which he is threatening to sell to others than the plaintiff in violation of his agreement, and would do so unless restrained and enjoined from so doing; that plaintiff had no adequate remedy at law, and prayed that the defendant be restrained and enjoined from delivering any of such wheat to anyone other than the plaintiff; that plaintiff have judgment against defendant for 25 cents per bushel for the wheat sold by defendant in violation of said agreement and for costs, expenses and attorney's fees in connection with the action.

The answer acknowledged the incorporation of the plaintiff, admitted that defendant had signed the application for membership and the marketing agreement, but alleged that he had been induced to sign them by false and fraudulent representations of the agent of the plaintiff. Defendant further answered, alleging that he had, in fact, tendered his wheat to plaintiff's agent, John Mount, at Schulte. "The defendant told said Mount he wanted to sell his wheat to the association, but wanted to know the amount and when his wheat would be paid for, which the said Mount refused to tell him, and not being able to obtain any price for his wheat" he had stored it at another elevator. Defendant alleged that chapter 148 of the Laws of 1921, is contrary to laws heretofore enacted by congress; is in violation of the constitution of the state of Kansas, and is an attempt to create a monopoly on the sale of wheat; and further alleged that the plaintiff is improvidently managed; is insolvent; owns no property but what belongs to its members; and is financially irre-

sponsible. The answer prayed that plaintiff be enjoined from inter-
fering with the defendant in the sale or handling of his wheat, and
from claiming any rights under the contract concerning the wheat for
the years 1922, 1923, 1924 and 1925.

Upon the hearing of the application for a temporary injunction,
the plaintiff presented his verified petition, and moved the court to
grant the temporary injunction without further showing. This mo-
tion was overruled.

Plaintiff then offered evidence in substance as follows: The
defendant, Frank Schulte, testified, in substance, that he signed the
application for membership, but did not know whether he signed
the marketing agreement or not; he thought he signed only once.
His answer was offered in evidence. He thought he was signing a
marketing agreement and an application for membership in the as-
sociation. He had threshed about 1,600 bushels of wheat grown by
him in the season of 1922; had some of it in his bin at home and
about 1,000 bushels in the Red Star Elevator at Schulte for storage;
took it there because he could not sell it anywhere. It was his in-
tention to sell his wheat to the plaintiff association. He understood
that the association had a half interest in the Farmers Elevator at
Schulte. He went to the Farmers Elevator and talked to the man-
ager, John Mount, and told him he wanted to sell some wheat; told
him he would sell 1,600 bushels to the wheat growers. Mount said
he did not know whether he would want to take a chance on that
much, but tested the wheat. He did not take it up with the wheat
growers after that, but went to the Red Star Elevator and stored it,
and drew a check for one load. At the time he signed the contract,
Hoover, an agent of the plaintiff, told him he would draw 75 per
cent of the market price on delivery. He believed this statement to
be true and signed the agreement without reading it. He was thirty-
three years old and had good eyesight. Hoover gave him a copy of
the agreement; he took it home, threw it in the cupboard; did not
read it for four or five months and then did nothing about it.
Peter Springob was present when Schulte signed the contract and
heard Hoover tell him that he would get 75 per cent of the market
price of his wheat on delivery. John Mount testified that he was
manager of the Farmers Elevator at Schulte; that his elevator had a
contract with plaintiff to handle wheat, which was the only connec-
tion his elevator had with plaintiff; that the defendant came to the
elevator and wanted to know if he was prepared to handle the wheat,

and he told him he was. Defendant said he had 1,500 or 1,600 bushels and wanted witness to tell him what he would get out of his wheat. Witness could not do that. Defendant wanted witness to tell him what his wheat would bring. Witness understood that they were paying 60 per cent of the current price. Defendant asked him to go out and test his wheat and he did. It tested No. 4 and was worth about 88 cents. When a member of the plaintiff association wants to deliver wheat the Farmers Elevator receives it, weighs it and tests it, puts it in the bin, and reports to the association on blanks furnished by the association for that purpose, which did not indicate the price. He did not figure the price. He had facilities for handling defendant's wheat for the plaintiff association and would have handled it had defendant delivered it. He was also furnished blanks for a member of the association who desired an advancement of money on his wheat. Where a member desired, the blanks were filled out and sent in to the association and the amount of the advancement sent to the member. He had these blanks in his possession at that time. Clarence Champ testified that he was buying grain for the Red Star Milling Company at Schulte; that he tested defendant's wheat; told him what the market price was at that time, but made no bid on it; that defendant was undecided what to do with it, and he told defendant he could dump it at his elevator. Defendant brought the wheat to his elevator and dumped it there, where it was put in a separate bin. He paid defendant $48.60 for one load of fifty-four bushels. L. L. Wilson, president of the plaintiff, association testified in substance that when a member delivered his wheat, a grower's certificate for wheat delivered was sent him, showing when and where delivered, the amount, grade and test. That for the members who desired an advance payment on their wheat, they had a form of application to be signed by the member, and sent in to the home office, and that arrangements had been made with a bank to advance the member the money upon his signing a receipt. The percentage of advance arranged for the wheat of 1922 was 60 per cent of the average terminal market price, less freight and local handling charges. The witness testified generally to the plan of the association for handling wheat, which was in accordance with the general plan and by-laws of the association. Ernest Downie, secretary of the plaintiff association, testified that the association had 2,535 members, with 404 of them in Sedgwick county; that on June 26, he mailed a letter to defendant advising him that

Wheat Growers Association v. Schulte.

arrangements had been made to handle his wheat, and that if he desired to have any money advanced on the wheat he would find forms for that purpose at the local bank or elevator, or with the local secretary, or they could be supplied from the general office; that the association published a weekly paper, which was sent to all its members; that in one of the issues of the paper was printed an article stating the amount of money which the association had arranged to advance upon the wheat, being 57 cents per bushel, plus freight and handling charges, amounting to about 73 cents per bushel on No. 1 wheat. Theodore Smith testified that he was president of the local association at Schulte, and testified to a conversation in which the defendant made the argument that he would not sell his wheat unless he knew the price to be paid. G. C. Hoover testified that he solicited the defendant for membership in this association and detailed the circumstances under which defendant signed, and said there was very little talk about the contract, and that a few days later the defendant went with hi mfor a day or two to solicit other members for the association, and that he had talked with the defendant about two months later and defendant told him he was going to stick by his contract, and that he hoped the fellows who did not do so would have to sell their wheat at 50 cents a bushel. The articles of incorporation, application for membership, marketing agreement, contract between the plaintiff and Farmers Elevator of Schulte, by-laws of the association, blanks for the use of members in delivering wheat, and in making applications for loans thereon, the letter of June 26, from the secretary to the defendant, and the article printed in the association's paper concerning the advancement of money to members on their wheat, were offered in evidence.

The court sustained a demurrer to plaintiff's evidence and denied the injunction.

Appellant does not make much complaint about the validity of the statute except as to section 16, which we will presently notice. Under similar statutes, where questions have been raised, it has been generally held that an organization of this character is not an unreasonable combination in restraint of trade, neither does it create an unlawful monopoly in the sale of such products. (*Ex Parte Baldwin County Producers Corporation*, 203 Ala. 345; *Anaheim C. F. Assn. v. Yoeman*, 51 Cal. App. 759; *L. & N. R. R. v. Burley Tobacco Society*, 147 Ky. 22; *Castorland Milk & Cheese Co. v. Schantz*, 179 N. Y. Supp. 131; *Tobacco Growers Coöp. Assn. v. Jones*, [N. C.] 117

S. E. 174; *Owen County Burley Tobacco Society v. Brumback*, 128 Ky. 137; *Cal. Raisin Growers Assoc. v. Abbott*, 160 Cal. 601.)

From the evidence, it is clear that the real reason defendant had for not delivering his wheat to the association was that he could not learn at the time of delivery the price he would ultimately receive for it. This is stated in his answer, and shown by the testimony of John Mount, manager of the elevator at Schulte, to receive wheat for the association, and by the testimony of Theodore Smith, president of the local branch of the association. Naturally, it was impossible for the association to give him that information at the time of delivery. By the process necessary for the association in marketing, it would not know probably until the close of the marketing season, the price received for defendant's wheat, and all wheat of the same grade handled by it. And defendant, by signing the application for membership in the association and the marketing agreement, consented in writing that the association should handle his wheat in a manner that it would be impossible, either for the association or for him, to know at the time of delivery the price he would ultimately receive. Hence, his insistence that he be told at the time he delivered his wheat the price he would ultimately receive for it, was unreasonable and did not justify him in refusing to deliver.

As to the construction which should be placed upon section 16 of the act, the trial court commented as follows:

"In the first place, I do not just exactly agree with the contention of counsel that this law means that upon the filing of the verified complaint and bond, that the association shall be entitled to a restraining order which is a temporary injunction. It is my judgment that that means that upon the filing of the verified complaint and the filing of a bond, that the association shall be entitled to a temporary restraining order, which, in its legal effect is nothing more nor less under this statute than the ordinary restraining order; that, after the issuance of a temporary restraining order, either under the statute or under this whatever you may call it—that it then becomes necessary upon the application of either party to set down a hearing upon that application for a temporary injunction; so that, if that is the true position, then this is a hearing upon an application for a temporary injunction at a point in the proceedings which has been arrived at by the filing of the complaint and the bond under this statute. Now, if that position is true, then the court has a right and it is his duty to hear at this time the question as to whether or not a temporary injunction should be granted. On the other, if this statute means that upon the filing of this complaint and a bond, that the association shall be entitled to a temporary restraining order and preliminary injunction against the member, and that preliminary injunction against the member is to the same effect as a temporary injunction, then in my judgment that law is just

absolutely bad, if it means that because of the fact that if it is mandatory to that extent that it deprives the court of any right to investigate; it deprives him of all discretion; it deprives him of every conceivable sort of a right to do anything or take any action.

"If that is true, then from all the evidence that has been taken this afternoon—yesterday and to-day—all evidence that has been taken, all evidence and proceedings of every kind and character are absolutely nugatory and of no force and effect.

"Now, I do not believe that the legislature ever intended on behalf of a bunch of farmers, on behalf of a bunch of lawyers, on behalf of a bunch of doctors, on behalf of a bunch of chiropractors or barbers, or any class— to just absolutely upset the entire system of law of the state as it has been laid down, and as it has been followed since the formation of the state of Kansas. I do not believe they mean that and I do not believe any court will ever hold it. It may be they will."

And in this connection appellee says in his brief:

"Volumes have been written (legal and profane) on the equal division of the powers of the government under which we live, executive, legislative and judicial, each supreme within its own field. Our legislature in passing the co-operative marketing act did not attempt to invade the precincts of the judicial field. It doubtless would if it could to help out the farmer. It has gone as far as it dared; but to interpret the provisions of the act relating to the issuance of restraining orders and temporary injunctions, as plaintiff's counsel would have the court interpret it, would make the court a mere automaton, deprive it of the right of investigation, and whether the 'verified complaint' be true or false, the discretionary right generally to issue the restraining order and temporary injunction in a given case, would in a wheat growers case like this be discretionary only in the event it gave the plaintiff what it wanted. Such effect can arise only from implication and it is respectfully submitted that such implication should not be indulged in and that the ruling of the court below, denying the temporary injuction, should be affimed."

So it becomes important for us to determine the meaning of that portion of section 16 of the act which reads as follows:

"Pending the adjudication of such an action, and upon filing a verified complaint [or petition] showing a breach or threatened breach, . . . the association shall be entitled to a temporary restraining order and preliminary injunction against the member."

The intimation of the trial court and the argument of appellee is to the effect that if the statute literally means what it says, it is a wrongful invasion of judicial power by a legislative enactment, and is therefore void. The trial court took the view that if the statute means that a restraining order should be issued upon the filing of the verified petition and giving bond and notice, given for the hearing of a temporary injunction upon which evidence would be heard and

at which hearing the court would be empowered to exercise the power of courts of equity generally, and grant or refuse the temporary injunction as he would find the facts to be in accordance with justice and equity, the statute so construed would be valid, otherwise void.

Upon this point we are forced to the conclusion that the position of the trial court and of the appellee is not well taken. Generally speaking, it is the function of the legislative branch of the government to enact statutes, which is, in effect, the laying down of rules and regulations applicable to the particular subject matter in hand, and a state legislature, except as it be limited by the provisions of the state constitution or by the federal constitution or federal statute or treaty, is its own judge of the general scope, as well as the details, of such legislative enactment. No provision of our state or federal constitution is cited, nor is any federal statute or treaty cited, which forbids the state legislature to prescribe the showing a party must make in order to be entitled to have the court grant a temporary injunction. The argument contains the suggestion that the legislative branch of the government does not have inherent power to tell the judicial branch of the government what to do, but, broadly speaking, every legislative enactment tells the judicial branch of the government what to do under given circumstances—that is, the legislative branch lays down the rule for the guidance of the court, and says what the result should be in favor of, or against, the party that brings himself within the rule, and in that way tells the court what judgment or decree should be entered. It is within the province of the legislature to determine the manner of procedure in courts—that is, to outline the rule by which a given state of facts may be presented to the court, either by pleading or evidence, or both. Broadly speaking, the function of the court is to say whether or not a party has shown, in the manner provided by the legislature, that he is entitled to certain relief, the nature of which relief has been defined by legislative enactment.

In 1 Story's Equity Jurisprudence, 14th ed., § 11, is was said: "But if the law has determined a matter with all its circumstances, equity cannot intermeddle." It is further said, the proposition that "Equity will relieve against a general rule of law, is (as has been justly observed) neither sanctioned by principle nor by authority."

In 21 Corpus Juris 22, it is said: "The statutes and laws of the land are as much the law in a court of equity as in any other court."

Wheat Growers Association v. Schulte.

In 15 C. J. 901, it is said:

"It is within the power of the legislature, subject to such provisions as may be incorporated in the constitution, to establish the procedure by which courts shall exercise their jurisdiction and where a positive rule of practice is established by statute the courts have no discretion in the matter."

In 12 C. J. 826, it is said:

"The legislature has power to regulate and control the forms of procedure for the administration of justice in the courts, subject only to express or clearly implied constitutional restrictions. But it has no power to interfere with the discretionary powers of the court in the course of judicial administration. Thus the legislature may regulate the procedure by which jurisdiction conferred by the constitution may be exercised, may regulate equity procedure, the administration of estates of deceased persons and the procedure in the appellate courts, but it may not substantially impair the constitutional jurisdiction granted, nor practically defeat its exercise. It is not competent to make such changes as to impair the enforcement of right."

In *Akin v. Davis*, 14 Kan. 143, in discussing the discretionary power of courts of equity in injunction suits, it was held: "An injunction *in limine* is not a matter of strict right." To the same effect is *Stoddart v. Van Lanlaningham*, 14 Kan. 18, and *Railroad Co. v. Meyer*, 62 Kan. 696, 64 Pac. 597.

In 22 Cyc. 746, it was said:

"An injunction, whether temporary or permanent, cannot as a general rule be sought as a matter of right, but its granting or refusal rests in the sound discretion of the court under the circumstances of the particular case. Especially is this the rule in the case of a temporary injunction where the granting of the injunction depends upon the determination of questions of fact and the evidence is conflicting. This discretionary power, however, is not arbitrary and unlimited, but must be exercised reasonably and in harmony with well established principles and where the case made out by the complainant is perfectly clear and he has complied with all the requirements of the law for the issuance of an injunction, he is entitled to the injunction as a matter of right."

In other words, where a party seeking an injunction has by his pleadings and proof shown that he is entitled thereto, under the law governing the relation of the parties, he is entitled to an injunction as a matter of right—just as any litigant should have judgment as a matter of right when his pleading and proof show he is entitled to it. (*Sullivan v. Steel Co.*, 208 Pa. St. 540; *Walters v. McElroy et al.*, 151 Pa. St. 549; *Depauw v. Oxley*, 122 Wis. 656; *Felsenthal v. Warring*, 40 Cal. App. 119; *Brown v. Railway Co.*, 126 Ga. 248; *Steinmetz v. Federal Lead Co.*, 176 S. W. [Mo.] 1049.).

As a matter of practice, it is common for temporary injunctions to be granted upon filing a petition showing a right thereto. In High on Injunctions, 4th ed., § 31, it was said: "Interlocutory injunctions are usually, though not always, granted upon the filing of a bill setting forth complainant's equities and concluding with a prayer for the relief."

Section 5525 of the General Statutes of 1915, providing for the granting of injunctions in intoxicating liquor cases, states the provision in this language: "The injunction shall be granted at the commencement of the action and no bond shall be required."

In *The State v. Jepson*, 76 Kan. 644, 92 Pac. 600, the question was raised as to whether or not this statute transgresses the discretionary power of a court of equity in granting temporary injunctions. The court said:

"Whenever such an application is made the court or judge, in determining the sufficiency of the showing therefor, has the same judicial discretion that exists when other questions of fact are determined. In all such cases the general rule that the language of the statute will be liberally construed for the purpose of upholding and promoting its object, and that strained and technical interpretations of its provisions for the purpose of impairing or defeating its manifest purposes will be avoided, is applicable. And when under such rule of construction a fairly reasonable showing has been made, the state is entitled to the writ." (Syl. ¶ 4.)

It will be observed that under the wording of the statute in question, the court is not peremptorily required to grant the temporary injunction, but the statute states the showing to be made and the conditions to be performed by the association which shall entitle it to a temporary restraining order and preliminary injunction against the member. The statute is really an enabling act, authorizing the formation of associations to carry out the purposes expressed in section one of the act. The language of the statute should be liberally construed for the purpose of promoting its object. Its provisions should not receive a strained and technical interpretation for the purpose of defeating its manifest purposes. Properly construed, section sixteen is not void as being an improper legislative restriction upon the judicial discretion of courts of equity. When a reasonable showing has been made, the association is entitled to a temporary injunction upon giving a proper bond.

This association was organized for the sole purpose of marketing the wheat raised by its members, and performing such functions as are incidental thereto. From the very nature of things it must have

the wheat or it cannot exist. It has no power to buy wheat, hence it cannot go into the open market and purchase wheat to fill its contracts of sale and sustain its existence or recoup its loss, if the members fail to deliver. Even the payment of damages of 25 cents per bushel, stipulated to be paid by a member for each bushel he produces and sells elsewhere, would not sustain the association and enable it to do the business for which it is incorporated. Hence, as a practical matter, it is of little consequence that the member is solvent and able to respond in damages. If the association received damages from all, or a substantial portion of its members, it would cease as a going concern, or be so seriously handicapped as to destroy its usefulness. Wheat is the only commodity the association can use as a going concern. All it can do with money is to pay its expenses and disburse the balance among its members. It necessarily follows that there is no adequate remedy at law. The only adequate remedy is injunction, preventing the member from selling to others and thus forcing the delivery of the wheat to the association. (*Washington Cranberry Growers Assn. v. Moore,* [Wash.] 201 Pac. 773; *Phez Co. v. Salem Fruit Union,* 103 Ore. 514; *Owen County Burley Tobacco Society v. Brumback,* 128 Ky. 137.)

Appellee contends that the verified petition in this case, though possibly sufficient as a statement of plaintiff's cause of action to try the case upon its merits treated as an affidavit in support of the application for a temporary injunction, does not make a sufficient showing for that purpose.

In *Olmstead v. Koester,* 14 Kan. 463, it was held:

"When a verified petition is used as an affidavit, its allegations must be construed as those of an affidavit, and must be such statements of fact as would be proper in the oral testimony of a witness. Allegations which are simply conclusions of law, whether sufficient or not as matter of pleading, are incompetent as testimony." (Syl. ¶ 1.)

To the same effect is *The State v. Telephone Co.,* 77 Kan. 774, 95 Pac. 391, and cases there cited.

Tested by these decisions the petition did not set forth the facts with the particularity an affidavit should do, or that would be required in the testimony of a witness, necessary to make a showing of plaintiff's right to an injunction contemplated by the statute. Hence, the court did not err in refusing the temporary injunction upon the petition used as an affidavit.

Upon the hearing, however, the showing was made. It is not nec-

essary to repeat a synopsis of the evidence, but it is sufficient to say that it supplied all the particulars necessary to make the showing, contemplated by the statute, to entitle plaintiff to a temporary injunction. Appellee contends that defendant's answer alleged fraudulent representations of plaintiff's agent in the inception of the contract sufficient to defeat it, and that plaintiff, by offering defendant's answer in evidence, proved the fraud and for that reason was not entitled to the injunction. It is the rule that the answer of the defendant is competent evidence against him as his statement under oath. (21 C. J. 560.) Whether it was given greater effect by being offered in evidence need not be determined, in view of the fact t at defendant was a witness, and testified to this alleged fraud. The agent, Hoover, and Peter Springob, who were present, also testified. It is clear that there was very little if any fraud about the matter, and the court did not refuse the injunction for that reason. It is also clear that the fraud, if any, did not control the defendant in refusing to deliver his wheat. The reason he did not deliver it, as made clear from the evidence, is that he had concluded not to deliver it unless he knew what price he was to receive for it. As previously observed, he was not warranted in refusing for that reason.

The judgment of the court below is reversed, for further proceedings in accordance with this opinion.