# MINNESOTA WHEAT GROWERS CO-OPERATIVE MARKETING ASSOCIATION v. WILLIAM HUGGINS, JR.[1]

April 9, 1925.

No. 24,645.

**Co-operative Marketing Act liberally construed.**
1. Sections 6079-6113, G. S. 1923, known as the Co-operative Marketing Act, being an enabling act authorizing the formation of associations to carry out the purposes expressed in the statute, must be liberally construed.

**Contract between association and member construed.**
2. A contract between such association and a member construed as containing a mutual and valid consideration and not unilateral.

**Act does not violate constitutional provision against monopolies.**
3. The Co-operative Marketing Act does not contravene section 35, article 4, of the state Constitution.

**Nor does it violate provision respecting due process of law.**
4. The Co-operative Marketing Act does not contravene the Fourteenth Amendment to the Constitution of the United States declaring that no state shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

**When due process of law is secured.**
Due process of law and the equal protection of the laws are secured if the laws operate on all alike and do not subject the individual to an arbitrary exercise of the powers of government.

**Classification in act is authorized.**
The classification in the Co-operative Marketing Act is within the power of the legislature.

**Inapplicable sections of state Constitution.**
5. Article 1, §§ 2, 5, and 8 of the state Constitution are without application.

[1]Reported in 203 N. W. 420.

**Act does not restrict interstate commerce.**

6. The Co-operative Marketing Act does not control or burden interestate commerce nor restrict the freedom of the market in interstate commerce.

**Money payment liquidated damages.**

7. Provision for the payment of money in consequence of a violation of a membership contract construed as liquidated damages rather than a penalty.

**Injunction is remedy for breach of contract by members.**

8. Liquidated damages for the breach of a membership contract with an association organized under the Co-operative Marketing Act do not give a full, complete and adequate remedy. The only adequate remedy is an injunction preventing the members from breaching their contracts and thus indirectly forcing the delivery of the product to the association.

*Headnote 1.   See Agriculture, 2 C. J. p. 990, § 5.

Headnote 2.   See Agriculture, 2 C. J. p. 992, § 9 (1926 Anno).

Headnote 3.   See Monopolies, 27 Cyc. p. 910.

Headnote 4.   See Agriculture, 2 C. J. p. 990, § 5; Constitutional Law, 12 C. J. p. 1137, § 860; p. 1145, § 878; p. 1160, § 895 (1926 Anno); p. 1195, § 961; p. 1273, § 1074 (1926 Anno).

Headnote 5.   See Constitutional Law, 12 C. J. p. 1124, § 841 (1926 Anno); p. 1220, § 997; Criminal Law, 16 C. J. p. 1358, § 3200.

Headnote 6.   See Commerce, 12 C. J. p. 83, § 112.

Headnote 7.   See Damages, 17 C. J. p. 945, § 238.

Headnote 8.   See Injunction, 32 C. J. p. 191, § 289; p. 226, § 355 (1926 Anno).

Action in the district court for Polk county for specific performance of a contract and for other relief. Defendant's demurrer to the complaint was overruled and the questions raised certified, Watts, J. Defendant appealed. Affirmed.

*T. J. Mangan,* for appellant.

*Arthur Le Sueur,* for respondent.

WILSON, C. J.

This action involves the Co-operative Marketing Law, §§ 6079-6113, G. S. 1923, and the right of the association to enforce a member-

ship contract made in harmony with the statute. Defendant's demurrer to the complaint was overruled and the court having certified that the questions raised were important and doubtful, the defendant has appealed.

It is claimed by the appellant as follows: (a) That the contract between appellant and the association is void and unenforceable for want of mutuality; (b) that it is designed to create a monopoly and is a combination in restraint of trade; and that plaintiff is a combination of persons to monopolize the markets for food products contrary to section 34, article 4 of our state Constitution; (c) that plaintiff's organization is in contravention of the provisions of the Fourteenth Amendment to the Constitution of the United States in that it denies the equal protection of the laws to persons other than those named and therein referred to and deprives appellant of his property without due process of law; (d) that it contravenes the provisions of sections 2, 5, and 8 of article 1 of our Constitution; (e) that said statute is unconstitutional for the reason that it has the effect of controlling and burdening interstate commerce and regulates and restricts the freedom of the market in interstate commerce; (f) that said statute is unconstitutional wherein it provides for the infliction of penalties upon the appellant and that said contract is contrary to the established public policy of this state; (g) that plaintiff is not entitled to equitable relief and has an adequate remedy at law.

1. The statute is an enabling act authorizing the formation of associations to carry out the purposes expressed in the statute. Its language must be liberally construed for the purpose of promoting its object. Its provisions should not receive a strained and technical interpretation for the purpose of defeating its manifest purposes. Kansas W. G. Assn. v. Schulte, 113 Kan. 672, 216 Pac. 311; N. Wis. Coop. T. P. v. Bekkedal, 182 Wis. 571, 197 N. W. 936.

(a) 2. The assertion is made that this contract is lacking in mutuality of obligation and is unilateral in character. The statute authorizes the contract. The contract expresses mutual obligations. The consideration is obvious. A contract is not unilateral where it contains mutual obligations binding on both parties. It

is also supported by the obligation of third persons. Texas Farm Bureau Cotton Assn. v. Stovall, 113 Tex. 273, 253 S. W. 1101; Hollingsworth v. Texas Hay Assn. (Tex. Civ. App.) 246 S. W. 1068; Potter v. Dark Tobacco Growers Co-op. Assn. 201 Ky. 441, 257 S. W. 33.

(b) 3. Defendant says the association is a monopoly and that its manner of doing business constitutes a restraint of trade. If this statute will permit the association to have control of the wheat market so that it may at pleasure raise the price of wheat above its real value or above what it would bring under competition, it would be a monopoly. If it may lower or raise prices at will, it is a monopoly. Pulp Wood Co. v. Green Bay Paper & Fiber Co. 168 Wis. 400, 170 N. W. 230. section 35, article 4, of our Constitution says:

"FREEDOM OF MARKETS—MONOPOLIES—Any combination of persons, either as individuals or as members or officers of any corporation, to monopolize the markets for food products in this state, or to interfere with, or restrict the freedom of such markets, is hereby declared to be a criminal conspiracy, and shall be punished in such manner as the legislature may provide."

This provision of the Constitution is restrictive only. It says that persons must not monopolize the markets for food products, or interfere with or restrict the freedom of such markets.

The association handles only the products of its own members. It does so without profit. There is no capital stock. The law authorizes the making of membership contracts and specifies remedies for breach thereof. One of the main features of this law is to minimize the expense of the middleman. It also tends to protect the farmer against alleged unscrupulous conduct of others in the market. The sole purpose of this law is, by an economical marketing of the crop owned by its members, to obtain to them a fair and reasonable price, without useless expense, and without necessarily increasing the cost to the consumer. The association advances money to the members for their immediate needs, protecting them from having to sell on an unsatisfactory market. No

one can join the association but a producer. He is not forced to join. He does so voluntarily. It is entirely optional with every producer. Each member has but one vote. It is an organization of farmers, and farmers are characteristically meticulous. The citizendom of the state is not complaining. In fact, this law puts the association under the supervision of the public examiner who is authorized to take possession of its property, if he is of the opinion that its further operation is hazardous to the public interest. This gives assurance that the public will learn at all times how the business is being conducted and will know that it is not being conducted in a manner detrimental to the public welfare. Any of the officers are subject to removal by the Governor.

Subsequent to the World War the returns to the farmer were pitifully inadequate. His lands depreciated in value. The things he had to buy did not depreciate proportionately. His condition was critical. The state, and in fact the government, responded to a sympathetic cooperation in an economic rehabilitation of the stability of the agricultural interest. The policy of our nation is apparent in exempting agricultural organization, instituted for the purpose of mutual help, and not having capital stock or conducted for profit, from the operation of the Sherman Anti-Trust Act. Section 8835 of U. S. Comp. St. vol. 8, p. 9686. Also by 42 U. S. St. at large, c. 57, adopted February 18, 1922, p. 388, which act, like the one under consideration, provides for government supervision. It is for the interest of our social, moral and financial welfare that the producers in our state be able to materially succeed so that they may enjoy and be inspired by reasonable success and achievements and thereby be the better enabled to properly carry on the duties of citizenship. It was clearly to this end that this law was enacted. About three-fourths of our states have now enacted such laws. Cooperative associations are favored by our laws. Such associations cannot live in the absence of harmony within.

Section 35, article 4, of our Constitution does not say how marketing shall be done; nor does it preclude the regulation thereof. As indicated above, the legislature has surrounded this law with every safeguard against it possibly resulting in a monopoly and if its

declared lawful purposes should, by unscrupulous officials, be diverted into those illegal transactions, which would subject it to the assault now made upon it, its immediate death would be certain. The law is purely one of expediency and to better the economic condition of the producer. This statute makes the association possible. The association frees the market, makes it more open, less one-sided, less subject to manipulation and monopoly control on the part of those who deal in the commodities. It aids and harmonizes with this constitutional provision which is aimed at those who hoard and speculate in food products and who interfere arbitrarily and artificially with the natural flow of commerce in such products. It offers a plan as a basis for hope that the market may be stabilized and protected from fluctuation incident to an entire year's crop being dumped upon the market within a period of 60 days and thereby demoralizing the market in the consequent fluctuation, in price, which, in practice, is detrimental to the producer and of little benefit to the public.

There is nothing in the organic law of the association that indicates that its purposes are in any way antagonistic to the Constitution or to section 10463, G. S. 1923, enacted pursuant thereto, or to the spirit and intent of the Co-operative Marketing Act. In fact, all the wheat owned by the members is sold upon the markets in open competition with dealers. The wheat is delivered to local elevators. The same agencies and instrumentalities are used to put the wheat on the market. It reaches the same terminals, and is sold to the same millers. The association is merely a selling agency. As such agency it carries on the marketing for its members who pool the price in grain from time to time. The agency can do little more than a businesslike farmer who is financially able to choose his market. By reason of having credit, it may do more than a farmer whose finances will not permit him to wait for a satisfactory market. It may perhaps by selling in large quantities sell to better advantage, but no better than any other dealer or sales agency with ample capital. The association makes no effort to do anything that the individual member might not legally do for himself. We see nothing in the organization, if carried out in the

spirit and intent in which the law was passed, to infringe upon the constitutional provisions. The legislature has surrounded the organization scheme with every protection, so that if any attempt is made to violate the spirit and intent of the statute the parties are subjected to the restrictions of the law.

We do not say that this organization like any other corporation, association or individual may not violate the law. It may. If so, it may be punished the same as all other persons or corporations who transgress. These persons come both in the name and intent of an open, free and unrestricted market. They seek the privileges of such in equal competition with dealers. They ask for nothing more. The articles of association, by-laws and the statute under which it is organized proclaim its legality. Every provision of the contract which is pointed to as an element of the alleged act constituting a restraint of trade is authorized by the statute. The statute does not authorize anything forbidden by the Constitution. The element that puts a monopoly under the ban of the law is that it tends to prevent competition and enhances the price of the commodity involved or deteriorates quality or service and impoverishes the competitor, and these characteristics are absent in plaintiff's scheme of organization. The divergent opinion in this difficult field of legislative action should admonish us that we must not close the door to experiment within a law so surrounded by governmental watchfulness and control. Under similar statutes where questions have been raised it has been generally held that an organization of this character is not an unreasonable combination in restraint of trade, nor a monopoly in the sale of such products. Kansas W. G. Assn. v. Schulte, 113 Kan. 672, 216 Pac. 311, and cases cited; N. Wis. Coop. T. P. v. Bekkedal, 182 Wis. 571, 197 N. W. 936; Brown v. Staple C. Coop. Assn. 132 Miss. 859, 96 South. 849; Castorland M. & C. Co. v. Shantz, 179 N. Y. Supp. 131; Bullville M. P. Assn. v. Armstrong, 178 N. Y. Supp. 612; Poultry Producers v. Barlow, 189 Cal. 278, 208 Pac. 93; Tobacco G. Coop. Assn. v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231.

The object of such a co-operative marketing agency is to serve the financially weaker and more scattered members of society and

this is on the theory that by giving such aid to such persons it enures to the public welfare. Obviously there is a great difference with reference to the effect upon society between a combination of a few or many financially powerful men or corporations who are able to get together and dominate and control a particular industry and the prices of its products, and a combination of farmers each weak in his individual strength and financial power numbering into thousands and located here and there over a large territory. The most that can be expected from co-operative marketing organizations is an improvement in the condition of the agricultural classes. There is nothing in this arrangement relative to the price at which wheat shall be sold by the association. It has power and discretion to sell to best advantage. But it is not given all the power at the end of the bargain. A steady market and a reasonable price are the prominent features of the plan. The association is also ambitious to have a continuous market for the producer for 12 months in the year instead of two or three. It is difficult to understand how a steady market and a reasonable and profitable price to the producer would be inimical to the public welfare of the state. Such would be beneficial, not only to the producer, but to every person engaged in any business in the state. It is certain that those who might wish to monopolize the market would never adopt this law for their instrumentality. Financial discouragement from what is believed to be unfair dealing, like idleness, tends toward degeneracy. We see no opportunity in the lawful performance of the corporate duties of the association to interfere with or restrict the freedom of the markets, unless it may be said that this results from holding wheat to sell on a satisfactory market. Each farmer has this privilege. We see no reason why, under the restrictions imposed by the law, this association as a selling agency should not have the same privilege in this respect. If, technically, there is any such interference or restriction in this conduct, it is insignificant and no such interference or restriction resulting from a law of this character should have judicial recognition, unless the result thereof is detrimental to the public interests. Interested parties are entitled to fair protection. Wash. Cran. G. Assn. v. Moore, 117 Wash. 430,

201 Pac. 773, 204 Pac. 811, 25 A. L. R. 1077; Tobacco G. Coop. Assn. v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231; Georgia Fruit Exchange v. Turnipseed, 9 Ala. App. 123, 62 South. 542. The record fails to show such; and, it being equally silent as to any effort toward fixing prices, limiting production, controlling the market, or impoverishing competitors, there is no monopoly.

There is no justification for the suggestion that an orderly, systematized, cooperative marketing authorized by law to prevent a sacrifice of the farmers' products and to realize a reasonable profit has any analogy to financial combinations in restraint of trade which have at times tended to prevent the farmer from realizing a fair profit and a decent living. In fact, this cooperative measure may have more tendency to avoid monopolies by others than it does to create a monopoly by the limited number of farmers who will join it. This court is justified in taking judicial knowledge, as it does, of the economic conditions of the farmer in our country because they are matters of general knowledge, history and of public interest. In re Cons. Ditch No. 1, 157 Minn. 108, 195 N. W. 781; Tobacco G. Coop. Assn. v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231.

We are of the opinion that this statute does not offend section 35, article 4, of the state Constitution.

(c) 4. The defendant asserts that this statute denies him the equal protection of the laws and deprives him of his property without due process of law. The Fourteenth Amendment was designed not only to avoid arbitrary spoilation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; and that no restriction should be imposed to the pursuit of any one, except if applied to the same pursuits by others under like circumstances; and, that no person should be subjected to greater burdens than any other person in the same calling and conditions and that all persons should be treated alike, under like circumstances, and considering both the privileges conferred and the limitations imposed. And as said in Duncan v. Missouri, 152 U. S. 377, 382, 14 Sup Ct. 570, 38 L. ed. 485, due process of law and the equal protection of the laws are secured if the laws operate on all

alike and do not subject the individual to an arbitrary exercise of the powers of government.

The purposes of the Minnesota Co-operating Marketing Act are disclosed by section 6082, G. S. 1923, as follows:

"An association may be organized to engage in any activity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, preserving, drying, processing, canning, packing, grading, storing, handling, shipping, or utilization thereof, or the manufacturing or marketing of the by-products thereof, or in connection with the manufacturing, selling or supplying to its members of machinery, equipment or supplies; or in the financing of the above enumerated activities; or in any one or more of the activities specified therein."

By section 18, article 1, of Minn. Const. recognition is given to the fact that tillers of the soil stand in a peculiar position in reference to the marketing of their products and prohibits the imposition of a license to sell or peddle the same. The Supreme Court of the United States has said that "from time out of mind it has been the policy of this government, not only to classify for purposes of taxation, but to exempt producers from the taxation of the methods employed by them to put their products upon the market." Am. Sugar Ref. Co. v. Louisiana, 179 U. S. 89, 92, 21 Sup. Ct. 43, 45 L. ed. 102. The purposes of our co-operative marketing law are broad and of course include everyone alike. No one engaged in this occupation, no matter how little, is excluded therefrom.

Much emphasis has been given the case of Connolly v. U. S. Pipe Co. 184 U. S. 540, 556, 22 Sup. Ct. 431, 46 L. ed. 679, which arose in the state of Illinois by reason of their anti-trust statute. Section 9 of that statute said: "The provisions of this act shall not apply to agricultural products or live stock while in the hands of the producer or raiser." It was held that this section was repugnant to the Fourteenth Amendment of the Constitution of the United States and so connected and interwoven with other sections that its invalidity affected the entire act. The substance of the act may be grasped from a portion of the opinion which is as follows:

"Looking specially at its provisions, it will be seen that, so far as the statute is concerned, two or more agriculturalists or two or more live stock raisers may, in respect of their products or live stock in hand, combine their capital, skill or acts for the purpose of creating or carrying out restrictions in the sale of such products or live stock; or limiting, increasing or reducing their price; or preventing competition in their sale or purchase; or fixing a standard or figure whereby the price thereof to the public may be controlled; or making contracts whereby they would become bound not to sell or dispose of such agricultural products or live stock below a common standard figure or card or list price; or establishing the price of such products or stock in hand, so as to preclude free and unrestricted competition among themselves or others; or by agreeing to pool, combine or unite any interest they may have in connection with the sale or transportation of their products or live stock that the price might be affected. All this, so far as the statute is concerned, may be done by agriculturists or live stock raisers in Illinois without subjecting them to the fine imposed by the statute. But exactly the same things, if done by two or more persons, firms, corporations or associations of persons, who shall have combined their capital, skill or acts, in respect of their property, merchandise or commodities held for sale or exchange, are made by the statute a public offense, and every principal, manager, director, agent, servant or employe knowingly carrying out the purposes, stipulations and orders of such combination is punishable by a fine of not less than two thousand nor more than five thousand dollars."

If the Minnesota Co-operative Marketing Law may be read or construed to authorize the producers to carry out a common plan of restriction in the sale of agricultural products; limiting, increasing, or reducing the price; preventing competition in their sale or purchase; fixing a standard or figure whereby the price thereof to the public may be controlled; making contracts whereby they would become bound not to sell or dispose of such products below a common standard figure or card or list price; or establishing the price of such products so as to preclude free and unrestricted competition

among themselves or others; or by agreeing to pool, combine or unite their interest in connection with the sale and transportation of such products that the price might be affected, then the Connolly case would be authority in support of the assertion that such marketing act would be in contravention of the Fourteenth Amendment. In discussing the application of section 35, article 4, of Minn. Const. we have expressly pointed out that this act does not authorize, permit or make it possible for the association to do any of these things now enumerated, but on the contrary we have indicated that in our view such a conclusion is antagonistic to the spirit and intent of the law and that for insurance and protection against a misuse of a valid law public supervision and governmental protection have been extended to it. The Connolly case very properly says they cannot be permitted to do with impunity that which is a crime for others to do. In this statute the producers are not permitted to do anything which under our laws is made a crime when done by others. The law in question classifies an industry and makes this law apply with absolute equality to all of those who bring themselves within the conditions imposed by the law and we are of the opinion that it in no way violates the Fourteenth Amendment and is not in conflict therewith. The question of classification presented is one of the power of the legislature and not the policy of the exercise of the power. Inter. Har. Co. v. Mo. 234 U. S. 199, 34 Sup. Ct. 859, 58 L. ed. 127, 52 L. R. A. (N. S.) 525. The Fourteenth Amendment does not withhold from the states the power of classification and, if the law deals alike with all of a certain class, it is not obnoxious to the charge of a denial of equal protection. Gulf, C. & S. F. Ry. Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. ed. 666. It only prescribes that the law have the attributes of equality of operation, and equality of operation does not mean indiscriminate operation on persons merely as such but on persons according to their relation. Magoun v. Ill. Trust & Sav. Bank, 170 U. S. 283, 18 Sup. Ct. 594, 42 L. ed. 1037. The law only requires the same means and methods to be applied impartially to all the constituents of each class so that the law shall operate equally and uniformly upon all persons in the same circumstances.

Ky. R. Tax Cases, 115 U. S. 321, 6 Sup. Ct. 57, 29 L. ed. 414.  In fact, the purposes of the law are so extensive and far reaching in authorizing co-operative organization because it takes in so large a territory for such activity as distinguished from such an organization to conduct a limited or particular class of business, that it seems the question of classification can have but little consideration. Northern Wisconsin Coop. T. P. v. Bekkedal, 182 Wis. 571, 197 N. W. 936, 943.

In any event, the propriety of the classification for the purpose of legislation is primarily for the legislature.  We assume that the legislature makes the necessary inquiry and rightly determines the propriety of the classification which it adopts, and we will disturb the legislative determination only when the classification is arbitrary and without reasonable basis.  Seamer v. G. N. Ry. Co. 142 Minn. 376, 172 N. W. 765; Mathison v. Minneapolis St. Ry. Co. 126 Minn. 286, 148 N. W. 71, L. R. A. 1916D, 412.  We conclude that the classification is proper.  Defendant is not denied the equal protection of the law.  He assumed the obligation of his contract because he wanted to.  The rules of law which prevent a repudiation of the contract and support the validity of the law are ordinary and are controlled by the usual principles of right and distributive justice, and consequently, the defendant has no support in his claim that the law authorizing this contract deprives him of his property without due process of law.  This claim is without merit.

(d)  5.  Sections 2, 5 and 8, article 1, of our Constitution have been called to the support of defendant, but we find them without application.

(e)  6.  Since we find that the statute does not restrict the freedom of the market in violation of section 35, article 4, of our Constitution, it necessarily follows that the statute does not control or burden interstate commerce nor restrict the freedom of the market in interstate commerce.

(f)  7.  It is said that the statute must fall because it inflicts penalties upon defendant and is contrary to the public policy of the state.  The public policy has been in the law itself adequately declared to the contrary.  We cannot say that 25 cents per bushel is

unjust or oppressive or out of all proportion to the damages which would result from a breach of the contract. We must, therefore, construe the amount as liquidated damages rather than a penalty. Potter v. Dark T. G. Coop. Assn. 201 Ky. 441, 257 S. W. 33, 36; State v. Southern C. O. Co. 154 N. C. 635, 70 S. E. 741.

(g) 8. Is the plaintiff entitled to equitable relief? The contract provides:

"20. Inasmuch as the remedy at law would be inadequate and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the Association, should the Grower fail to sell and deliver all of his wheat, the Grower hereby agrees to pay to the Association for all wheat delivered, sold, consigned or marketed by or for him other than in accordance with the terms hereof, the sum of twenty-five cents per bushel as liquidated damages for the breach of this contract, all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all of the contracting parties to each and all of the said contracts."

"21. The Grower agrees that in event of a breach by him of any material provision hereof, particularly as to delivery or marketing of any wheat other than to or through the Association, the association shall, upon further action instituted by it, be entitled to an injunction to prevent further breach thereof, and a decree for specific performance hereof, according to the terms of this agreement; and the Association and the Grower expressly agree that this agreement is not a contract for personal services or demanding exceptional capacity or talents; and that this is a contract for the purchase and sale of personal property under special circumstances and conditions and that the buyer cannot go into the open markets and buy wheat to replace any which the Grower may fail to deliver; and that this contract will be the proper subject for the remedy of specific performance in the event of a breach thereof. In the event of any breach or threatened breach of this contract any and all remedies provided for in the 'Co-operative Marketing Act' of this state shall be available."

The parties have thus provided for liquidated damages, but does that damage give the plaintiff a full, complete and adequate remedy? It does not. Plaintiff is entitled to equitable redress. It is, as stated, a co-operative marketing association, conducted without profit, limited exclusively to its members. Each member has similar contract relations with it. Each depends upon the other. Its success depends entirely upon the performance by the members. It must, to carry out its purposes, make contract for the disposal of the products acquired by the membership contracts. In making such contracts of disposal, as well as contracts for necessary instrumentalities needed in conducting its business, it must know that it will get the products contracted for. From the very nature of the association it must have the wheat or it cannot exist. Wheat is the only commodity it can use as a going concern. It does not have power to go into the market and buy it. It must have this information in advance and prepare for the future. It must arrange for help, capital and perhaps storage. If one or more members may disregard their contracts with impunity and a loss occurs, there is no way to meet such loss, and if it may be said to be a loss that must be met by the members who remain, then it is obvious that few persons would join or remain members. The consequence would be so serious to plaintiff that the remedy at law is wholly inadequate, nor can it be said that the legal remedy is either full or complete. The only adequate remedy is an injunction preventing the members from breaching their contracts, and thus forcing the delivery of the wheat to the association. The members' breach of such a contract is so fraught with consequences to both the association and the individual members thereof that equity cheerfully puts out its restraining hand with the admonition that the member under such circumstances must not violate the covenants he has voluntarily assumed. He is not compelled to grow wheat, but as long as he produces within the period of the contract, he must not sell to anyone but plaintiff, and he is thus indirectly or negatively required to perform the obligation of his contract.

Oregon G. Coop. Assn. v. Lentz, 107 Ore. 561, 212 Pac. 811; Kansas W. G. Assn. v. Schulte, 113 Kan. 672, 216 Pac. 311; North.

Wis. Coop. T. P. v. Bekkedal, 182 Wis. 571, 197 N. W. 936; Hollingsworth v. Texas H. Assn. (Tex. Civ. App.) 246 S. W. 1068; Texas F. B. C. Assn. v. Stovall, 113 Tex. 273, 253 S. W. 1101; Potter v. Dark T. G. Assn. 201 Ky. 441, 257 S. W. 33; Wash. C. G. Assn. v. Moore, 117 Wash. 430, 201 Pac. 773, 204 Pac. 811, 25 A. L. R. 1077; Phez Co. v. Salem F. Union, 25 A. L. R. 1090; Tobacco G. Coop. Assn v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. A. 231.

Such equitable redress is given regardless of the provision in the contract. Some authorities hold its incorporation, however, of significant importance. Potter v. Dark T. G. Assn. supra. Tobacco Growers Coop. Assn. v. Jones, supra. The statement of liquidated damages in the contract does not conclusively establish that the parties contemplated that upon breach thereof damages would be an adequate remedy. It is a question of intention in each case to be determined from the whole contract and surrounding circumstances. In this case it is expressly stated that equity may be invoked and it is the only adequate remedy. We must conclude that the parties intended that the contract would be enforced, and it will be.

Affirmed.