## No. 29,137.

THE KANSAS WHEAT GROWERS ASSOCIATION, *Appellant*, v. HARRY BRIDGES, *Appellee*.

(1 P. [2d] 265.)

Opinion filed July 3, 1931.

*George W. Cox, Lawrence Weigand, T. A. Noftzger,* all of Wichita, *W. E. Broadie,* of Kinsley, *Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson* and *Ralph W. Oman,* all of Topeka, for the appellant.

*A. L. Moffat,* of Kinsley, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was another lawsuit to enforce a coöperative marketing agreement between the Kansas Wheat Growers Association and one of its members, such as has often required the attention of this court.

The structure and scheme of the association has been stated many times and need not be repeated here. (*Wheat Growers Association v. Schulte,* 113 Kan. 672, 216 Pac. 311; *State, ex rel., v. Kansas Wheat Growers Ass'n,* 127 Kan. 669, 274 Pac. 731, and citations.)

The present case was here before for a review of a ruling on the sufficiency of the pleadings. (*Wheat Growers Ass'n v. Bridges,* 124 Kan. 601, 261 Pac. 570.)

Plaintiff sued to recover from defendant the sum of twenty-five cents per bushel for all the wheat marketed by him in 1923 and 1924 in violation of his marketing agreement. Plaintiff alleged that the conditions under which the marketing agreement was to become effective had in fact been accomplished. Those were to be con-

sidered as attained when the preorganization committee appointed by defendant and his fellow members should make a statement in writing, signed by its chairman, that the requisite signatures, acreage and bushelage had been secured to put the scheme into effect and to justify the incorporation of the plaintiff organization.

The gist of the defense was a denial that the chairman of the preorganization committee ever did sign any such statement prior to the incorporation of plaintiff, and in consequence his conditional marketing agreement never became effective. An affirmative defense also pleaded was that the conditional marketing contracts which the preorganization committee did secure were far short of the five-million bushelage required to set the scheme on foot according to the plans of its organizers, and that the specified acreages in the marketing contracts had been grossly falsified and raised in a fraudulent pretense that the requisite aggregate of five million bushels had been attained.

When this cause was formerly before this court it was held that defendant had a right to put in issue the question whether the preorganization committee in a writing signed by its chairman had made the formal statement that the requisite signatures of wheat growers had been secured to justify the creation of the plaintiff corporation.

The cause was tried by a jury. Unfortunately for plaintiff it failed in its proof that the requisite written statement to put the coöperative marketing agreement into effect had been made prior to the incorporation of plaintiff in 1921. The witness, W. H. McMichael, who had served as chairman of the preorganization committee, suffered a most inconvenient lapse of memory and could not tell when he had certified in writing to that essential fact. A writing bearing his signature was offered in evidence.

"Exhibit 6.

"The organization committee of the Kansas Wheat Growers Association hereby states that contracts with the said association were executed covering five million bushels of wheat of the 1921 crop, estimated, before the organization of the association.                W. F. McMichael, *Chairman.*"

It will be noted that this statement is without a date and its recitals clearly indicate that it is a narration of past events, not a statement of current facts at the time of its execution. It might have been made years after the incorporation of plaintiff. Its

potency was not strengthened by McMichael's testimony which, in part, reads:

"Q. I hand you exhibit 6, which has been offered in evidence by the plaintiff; is that your signature on that paper? A. Yes, sir.

"Q. When did you sign it? A. I can't tell you; it is not dated.

"Q. Yes, that is apparent. Did you sign it this year? A. I—no, sir, I did not sign it this year; it has been a long time since I signed it.

. . . . . . . . . . . . . . . . .

"Q. Now, when was the first time you saw that statement? A. I suppose the first time I saw it was when I signed it, but I don't know when that was.

"Q. Who gave it to you? A. I don't know.

"Q. You don't know who gave it to you? A. No, sir, I don't; there is nothing to show on it.

"Q. Do you know where that came from? A. No, sir, I don't.

"Q. What did you do with it after you signed it? A. There is nothing to indicate on this paper where it came from or where it went.

"Q. I am asking you? A. I don't know.

"Q. What did you do with that paper after you signed it? A. I have answered that question.

"Q. No, you haven't. I asked you what you did with that paper after you signed it? A. I don't know, I told you a couple of times.

"Q. You don't know who you gave it to? A. No, sir, don't remember a thing about it. All I know, this is my signature.

"Q. Where were you when you signed that paper? A. I don't know that."

There was evidence tending to show that the figures representing the acreages in the marketing contracts had been altered and raised. Typical of these was one where the grower had stated in his agreement that he was growing 187 acres of wheat. The figures were altered to read 487 acres. A fair inference was that this alteration was mere falsifying so as to carry into effect the pretense that enough growers representing enough acres at the average yield per acre to make an aggregate of five million bushels had agreed to go into the coöperative marketing scheme and had bound themselves to pay twenty-five cents a bushel for every bushel grown by them which they should market otherwise than through the coöperative facilities of the plaintiff organization. A general verdict was returned for defendant and the jury made special findings of fact, some of which read:

"2. Do you find that the organization committee found that it had secured contracts with amendments thereto totaling an estimated production of five million bushels of wheat for the 1921 crop? A. No.

"3. Did W. H. McMichael as chairman of the organization sign a written

statement to the effect that said committee had found that amended contracts had been signed for an estimated production of five million bushels of wheat of the 1921 crop? A. No.

"4. Did the organization committee at any time act fraudulently or in bad faith in the conduct of its business? A. Yes.

"5. If you answer question No. 4 in the affirmative, then state wherein they so acted. A. By altering contracts."

Judgment was entered for defendant, and plaintiff appeals. Its counsel discuss interesting questions, particularly the point that if there was any falsifying of the acreage figures or any other fraud in computing the bushelage to make a *prima facie* showing that the requisite conditions had been created to warrant the incorporation of the plaintiff such delinquencies were attributable to defendant and those in like situation with him who sanctioned the creation of the preorganization committee and clothed it with plenary authority to make the proper computations and to supervise the preliminaries and to authorize the chairman to sign the written statement certifying that all the prerequisites to effect a binding coöperative organization had been accomplished.

But as we view the record we will not have a chance to pass upon the merits of that argument. The marketing agreements were not to become effective unless and until the written statement of the committee had been executed by the signature of its chairman. Plaintiff's petition alleged—

"It was further agreed, between the parties hereto, in said contract that for all matters of production or signatures and for all statements of facts in connection with said contract that the written statement of the organization committee, signed by its chairman, should be absolutely conclusive with or without notice to the subscriber.

"It was decided in August, 1921, that the signatures of growers of wheat had been secured representing over five million bushels of wheat for the estimated production of the year 1921."

Those allegations were in accord with the provisions of the proposed marketing agreement to which defendant Bridges had given his assent. Pertinent parts of that agreement read:

"13. (a) If by June 15, 1921, signatures of wheat growers or persons eligible to membership covering at least 51 million bushels of the 1921 crop [reduced by amendment to 5 millions] shall not have been secured for this agreement, the organization committee shall so notify every subscriber at his address noted below prior to July 1, 1921, and cancel his signature and the agreement signed by him. . . .

"(b) If signatures of the growers of 51 million bushels [reduced to 5 mil-

lions] shall be secured by the said date, June 15, 1921, then this agreement shall be binding upon all of the subscribers in all of its terms and there shall be no right of withdrawal whatsoever. . . .

"(c) For all matters of production or signatures and for all statements of facts in connection herewith, the written statement of the organization committee, signed by its chairman, shall be absolutely conclusive, with or without notice to the subscriber."

So far as the instant case is concerned the special findings of the jury, Nos. 2 and 3, are determinative of the issue of fact upon which the liability of defendant was pleaded and predicated. The result is that the judgment must necessarily be affirmed.

It is so ordered.