Staple Cotton Co-op. Ass'n v. Borodofsky.*

(Division A. June 15, 1926.)

[108 So. 802. No. 25216.]

1. AGRICULTURE.
   Releasing certain members of co-operative association from operation of marketing agreement, which required member to deliver cotton to association, *held* breach of contract, releasing other members from adhering thereto.

2. EQUITY. *After co-operative association brought bill in chancery to enforce contract against member, equity retains jurisdiction to grant full relief, making it unnecessary that cross-bill to annul contract make all members parties.*
   Where co-operative association brought a bill in chancery to enforce contract against member, equity retains jurisdiction to administer full relief, making it unnecessary that all members be made parties to cross-bill for cancellation of contract.

3. AGRICULTURE. *Member of co-operative association held not estopped to assert right to cancel contract because other members had been released from obligations.*

Member of co-operative association is not estopped to assert right to cancel contract on ground that certain members have been released from their obligation to deliver cotton to association, because of having delivered cotton prior to bringing cross-bill for cancellation, where cross-bill was filed immediately on learning of such breach of contract by association.

*Corpus Juris-Cyc References: Agriculture, 2CJ, p. 998, n. 31 New; Equity, 21CJ, p. 134, n. 5; Co-operative marketing of farm products by producers' associations, see notes in 25 A. L. R. 1113; 33 A. L. R. 247.

APPEAL from chancery court of Bolivar county, Second district.

Hon. S. I. Osborne, Special Chancellor.

*R. C. McBee,* for appellant.

The defendants filed a supplemental answer and a cross-bill, which prayed for a rescission of the marketing agreement with the association. The cross-bill alleges that the marketing agreement, together with the articles of association and a contract called the standard contract of the association, are trilateral contracts, being contracts between the Borodofskys, the other members, and the association; that it was the purpose of all the parties thereto to sell all of the cotton produced or acquired by the members of the association during the term of the contract; and that the consideration of the contract was that it should be kept by each and every member and that its entire purpose would be defeated if such contracts were not adhered to by each and every member.

The cross-bill alleges that, although the Borodofskys have at all times complied with their contract, the directors of the association have released, beginning in the year 1922 and each year thereafter, a total of one

hundred thousand bales of cotton per year, by agreeing that the same should not be delivered to the association but sold through channels other than the association, and that such sales inflicted irreparable damages upon the Borodofskys to the extent that the purpose of the contract was not only entirely defeated, but in fact had been abandoned by the directors; that such action on the part of the directors has so increased the amount of cotton offered for sale in competition with the association, that the association has not yet been able to realize for its members a price for their cotton within three cents per pound of the amount realized by non-members selling cotton in the same territory in which the association is operated.

The association filed its answer to this cross-bill, denying in the first place that the articles of association, the marketing agreement and the standard contract are trilateral contracts entered into between the defendants and members of the association; it alleges that the standard contract was an organization contract which was signed by certain cotton growers in order to effect the organization of the association; that thereafter the association was organized and this preliminary agreement became merged in the articles of association, and that the application for membership and the marketing agreement are the only contracts signed by the Borodofskys; they deny the purpose of the association was abandoned or set at naught by any action of its directors, and deny that any member of the association has ever been released from his contract with the association.

The association alleges that under and by virtue of the terms of its articles of association and by its by-laws and under its marketing agreement, it appearing to its directorate that in order to procure a loan of money and the furnish of goods and supplies for certain of its members and directors, it was necessary for the cotton to be released and subordinated merely to a mortgage to the respective mortgages of such members and

directors and that unless such release was granted that the members could not obtain the money and supplies; that such releases were in a number of instances made by it, all of which were authorized by its charter, by-laws and marketing agreement, and none of which were in form and effect as alleged in the cross-bill and denies that any of the releases had any effect whatsoever upon the sale of the Borodofskys' cotton or the price they received for it.

The only parties to this lawsuit are the Borodofskys and the association. Not only is the marketing agreement a contract between the members and the association, but it is a contract between each member and every other member. Each member is obligated with every other member to do and to perform all the obligations resting on a member and to comply each for himself with the terms of the marketing agreement.

The marketing agreement as between A and B and the association constitutes one contract and in addition thereto it is a contract between A and B, all mutually and all severally thereunto bound. A has assumed certain obligations with B and likewise B has assumed certain obligations with A, while the association has assumed certain obligations with both A and B. A failure of the association to perform its obligation might be a breach of the contract between it and A and B, but that would not constitute a breach of the contract between A and B. No failure on the part of the association to perform could, in any possible manner, disturb the contractual relations existing between A and B. The only way in which the contract existing between A and B could be breached is for either A or B to fail to perform. In that way and in no other could that contract be breached.

That a cancellation of the contract between A or B and the association is likewise a cancellation of the contract between A and B cannot be doubted, so that one cannot be cancelled without at the same time and by the

143 Miss.—36.

same act cancelling the other. The cancellation of one is a cancellation of the other.

The value of the contract to A depends on B's adherence thereto. Let us assume for the moment that the association has proceeded in a manner which is conceived by A to be violative of the marketing agreement and which does in fact constitute a breach thereof, but B multiplied sixteen hundred times decides to waive the breach and proceed under the contract. A does not decide to do so. What happens? What can A do about it? Can he, without B's consent, withdraw from the contract? There has been no breach of the contract between him and B, and there is, therefore, no ground upon which he can base an action for the cancellation or rescission of that contract. Can he in an action against the association alone procure an agreement between himself and the association to be cancelled and thereby cancel the agreement between himself and B? He cannot. If the things of which he complains amounts to a breach of the contract between himself and the association, such a breach is not a breach of his contract with the other members of the association and furnishes no ground for the cancellation of the contract. An action for the cancellation thereof cannot be based alone on the failure of the association to comply with the terms of the contract between it and the members. The right of a member to proceed against the corporation alone to cancel the marketing agreement as to him does not exist. Black on Rescission and Cancellation, sec. 657.

*Was the breach of the contract sufficient to be called a discharge of the contract?* We are admitting for the moment only that there was a breach of the contract. All the proof is to the effect that the releases proved did not affect the price that the member received for his cotton; their only effect was upon the expenses to be paid by him. From the price obtained by the association for his cotton, he has always agreed that three per cent shall be deducted for expenses, which must pay all

expenses of operating the association. At the end of the year his agreement is that "the annual surplus from such deductions must be prorated among the growers delivering cotton in that year on the basis of deliveries." (Market agreement, sec. 5, in part.)   It is this annual surplus only that can be affected.

By the testimony of Mr. Bledsoe, who is the only witness to testify about what this expense amounted to, he said that the expense had never exceeded one and one-half per cent of the sales price.

Now stretching the proof to its furthest limits, all that can be said as to the size of the breach of the contract is that this surplus amounting to one and one-half per cent might have been larger, but the association had the right to spend that. It did not do it, but returned it at the end of the year. We say that even regarding that as a breach, it is not sufficient to discharge the contract.   See Black on Rescission and Cancellation, sec. 6.

Every breach of a contract is, of course, inconsistent with the contract; but every breach by one party does not authorize the other to renounce it *in toto*. *Mc-Allister-Coman Co.* v. *Mathews,* 1657 Ala. 361, 52 So. 416, 140 Am. States 43.

*Was a rescission of the contract justified?* The Borodofskys did not keep their contract in that they failed to deliver the cotton to the association in which they had an interest, and which cotton, under the requirements of the contract, should have been delivered. If this is true, we now submit that all question as to rescission of the contract is at an end, because clearly a party in default cannot rescind a contract. This is universally the law, and we take it that a long citation of authorities is unnecessary.   Black on Rescission and Cancellation, sec. 353; *Pester* v. *Hooker,* 7 S. & M. 768.

In order to obtain relief in a court of equity for the cancellation of contracts, the complainant must both plead and prove an irreparable injury. He did plead it

in his cross-bill but he wholly failed to show it in the proof. Whatever may be the definition of an irreparable injury, among other things necessarily included in it is that it is one that cannot be ''adequately compensated for in money or where the compensation cannot be safely measured.'' 33 C. J. 815. We submit that taking the case at best for the complainant, he has proved nothing in the neighborhood of an irreparable damage, but his proof lies in the twilight zone, between nominal damages and compensatory damages. *Internationl Realty Associates* v. *McAdoo* (Fla.), 99 So. 119.

*Was there a breach of the contract?* Thus far we have briefed this case conceding that there was a breach of the contract. We desire now to show that there was no such breach.

All of the releases introduced in evidence and testified about did not release the member. They subordinated the marketing agreement to the trust deeds of the bank, so that the bank might have a first lien upon the cotton. The situation was this: The member on account of a strained financial condition had applied to the bank or other mortgagee to finance his crop by lending him money and furnishing him supplies. This the bank was unwilling to do, saying in effect, ''Because you are a member of the association, it may be that when your note becomes due in the fall, you cannot pay it; for if you have delivered your cotton to the association, they will make you payments from time to time, as the cotton from the pool is sold and thus your note cannot be paid at maturity. I am willing to furnish you money and supplies if you can pay me for the same when due.'' Then the bank, and not the member, took up with the association the matter of whether or not it would subordinate its marketing agreement to the mortgage that was to be taken. They were not asked to release the member from his marketing agreement, nor were they asked to cancel the marketing agreement; but merely to subordinate its rights under the marketing agree-

ment to a trust deed which was about to be taken. The member could not make a crop unless such an arrangement was made. So the directors in their sound discretion concluded that it was best for the association, for its members, and for the territory in which they operated to subordinate the marketing agreement to the trust deed. This did not mean in theory or in fact that the association would not afterwards receive the cotton. The testimony is that in 1924, the year most of the releases were granted, that while in fact the association released approximately ten to twelve thousand bales of cotton, in reality in the fall it received a greater portion of this cotton released.

The authority of the directors of all institutions is usually to be found by a general grant of such power in its by-laws. The association has such a by-law, which is contained in this record. See article 4 of the by-laws.

If the directors had the authority to make and enter into contracts and agreements for and on behalf of the association and were vested with all powers incident to directors of corporations, we submit that they had the power and the authority to grant the releases complained of, and that there was, therefore, no breach whatsoever of the contract by the association.

*No damages should have been awarded I. L. Borodofsky on the injunction bond.* The interlocutory decree appealed from awarded damages against the association in the sum of two hundred and fifty dollars, and that judgment was reversed in the case of *Staple Cotton Cooperative Ass'n* v. *Borodofsky,* 104 So. 91. When the case was finally heard the above decree refered to was entered. This was error because, in the first place, it exceeded the one-hundred-dollar bond; and, in the next place, the damages being by attorneys' fees were not allowable in this suit. If any recovery was had at all, it should not have been for more than one hundred dollars. The recovery should have been upon the injunction bond. For the general rule in this regard, see 32 C. J.

434. See, also, *Florence* v. *Nixon,* 3 La. 289, *contra.* But the rule in Mississippi is in accordance with the general rule announced above.

This court has held without equivocation that "the recovery must be upon the injunction bond. To go beyond this, it is necessary to show malice and want of probable cause." *Manlove* v. *Vick,* 55 Miss. 567; *Anderson* v. *Falconer,* 34 Miss. 257.

*No damages should have been allowed.* The only damages allowed, as we have seen, were attorneys' fees. This, we submit, should not have been allowed. When the relief prayed for is injunctive relief alone, then it is proper to allow solicitors' fees as damages when the injunction is dissolved. But when the injunction is incidental, solicitors' fees should not be allowed. Griffith, Mississippi Chancery Practice, sec. 464, citing *Howell* v. *McLeod,* 127 Miss. 1; *Valentine* v. *McGrath,* 52 Miss. 112.

*Shands, Elmore & Causey* and *Lucy R. Somerville,* for appellee.

This case naturally divides itself into three sections: (1) Was Borodofsky compelled by the terms of this marketing agreement to deliver under this marketing agreement the part of the cotton belonging to his tenants and share hands? (2) Did the action of the association in releasing thousands of bales of cotton produced by other members of the association operate as a breach of the contract by the association? (3) If so, was this such a breach of the contract as to entitle Borodofsky to a decree of cancellation and rescission insofar as he was concerned?

I. *List of cases from this and other courts construing the marketing agreement and the relative rights of the association and the members thereof.* The following list of cases are such as we have read in our study of this question, all of which are recent, many of which do not

bear directly upon the precise questions involved, but all
of which tend to throw some light upon the relation
existing between a member of the Sapiro organization
and the organization and fellow members thereof.   It·
strikes us as being remarkable that counsel for appel-
lant, who appears from this record to be regularly re-
tained by this association and who is noted among all·
who know him for his intellectual energy, professional
activity, and painstaking thoroughness in the preparation
of his cases, has not been able to find anything in this·
long list of cases that he can submit to this court in de-
termining this appeal favorable to him.   It is in fact
remarkable in a brief of thirty-eight pages filed by him
to find that no case dealing with the relations between
one of these so-called co-operative associations and its
members is cited by him.

*Kansas Wheat Growers Ass'n* v. *Floyd,* 227 Pac. 336;
*Kansas Wheat Growers Ass'n* v. *Schulte,* 216 Pac. 311;
*Phez Co.* v. *Salem Fruit Union,* 205 Pac. 970, 201 Pac. 222;
*Texas Farm Bureau Cotton Ass'n* v. *Stovall,* 253 S. W.
1101, reversing 248 S. W. 1109; *Whitney* v. *Farmers'
Co-Op. Grain Co.,* 193 N. W. 103; *Washington Co-Op.
Eggs & Poultry Ass'n* v. *Taylor,* 210 Pac. 806; *Brown*
v. *Staple Cotton Co-Op. Ass'n,* 132 Miss. 859, 96 So. 849;
*Pierce Co. Dairyman's Ass'n* v. *Templin,* 215 Pac. 352;
*Tobacco Growers' Co-Op. Ass'n* v. *Jones,* 117 S. E. 174;
*Calif. Raisin Growers* v. *Abbot,* 117 Pac. 767; *Ore. Grow-·
ers' Co-Op. Ass'n* v. *Lentz,* 212 Pac. 811; *Hollingsworth*
v. *Texas Hay Ass'n,* 246 S. W. 1068; *Tobacco Growers*
v. *Bissett,* 121 S. W. 446; *Dark Tobacco Growers* v. *Ma-
son,* 263 S. W. 60; *Potter* v. *Dark Tobacco Growers Co-
Op. Ass'n,* 257 S. W. 33; *Feagain* v. *Dark Tobacco Grow-
ers Co-Op. Ass'n,* 261 S. W. 607; *New Jersey Poultry
Producers Ass'n* v. *Tradelius,* 126 Atl. 538; *Main* v.
*Texas Farm Bureau Cotton Ass'n,* 271 S. W. 178; *Long* v.
*Texas Farm Bureau, Cotton Ass'n,* 270 S. W. 561; *Haar-
parinne* v. *Butter Hill Fruit Growers,* 119 At. 116; *We-
natchee Dist. Co-Op. Ass'n* v. *Mohler,* 237 Pac. 300; *Row-·*

*land* v. *Burley Tobacco Growers Co-Op. Ass'n*, 270 S. W. 784; *Northern Wisconsin Pool* v. *Bekkedal*, 197 N. W. 936; *Wash. Cranberry Growers' Co-Op. Ass'n* v. *Moore*, 201 Pac. 773; *Citrus Fruit Ass'n* v. *Yeoman*, 197 Pac. 959; *Minn. Wheat Growers' Co-Op. Marketing Ass'n* v. *Radke*, 204 N. W. 314; *Minn. Wheat Growers' Co-Op. Marketing Ass'n* v. *Huggins*, 203 N. W. 420; *Atkinson* v. *Colorado Wheat Growers' Ass'n*, 238 Pac. 1117; *Northwest Hay Ass'n* v. *Hanson*, 236 Pac. 561; *Inland Empire Dairy Producers' Ass'n* v. *Meleander*, 235 Pac. 12; *Tobacco Growers' Co-Op. Ass'n* v. *Harvey*, 127 S. W. 545; *Redford* v. *Tobacco Ass'n*, 266 S. W. 24; *Tobacco Ass'n* v. *Dunn*, 266 S. W. 308; *Dark Tobacco Growers' Co-Op. Ass'n* v. *Alexander*, 271 S. W. 677; *Arkansas Cotton Growers' Co-Op. Ass'n* v. *Brown*, 270 S. W. 946; *Cole-McIntyre* v. *Dubard*, 89 So. 474.

II.   We come now to the question *vel non* of a breach of the contract by the association. Appellant opens his discussion of this question by calling attention to the fact that while it is true that the association released many thousands of bales of cotton which should have been delivered under the marketing agreement by members other than Borodofsky, still it did not release the member. It occurs to us that it is immaterial whether it released the member or not. The association was organized for the purpose of marketing cotton and at no time contemplated the marketing of members. We think it apparent that if it retained all of the members, but released all of the cotton, that the association would thereupon have become *functus officio.*

These associations have been given, by the terms of the contract and by statute law in about three-fourths of the states of the Union, most extraordinary rights and remedies. These provisions of the various statutes have been held constitutional by the courts and these provisions in the marketing agreement have been upheld as binding upon the members because and only be-

cause the courts have held that the very purpose of the organization was to control all of the cotton of its members, that the association could not function without these extraordinary powers to compel compliance by each and every member with the contract; and because the court has said that there is no way to measure the damage that would result to the association and to the other members thereof from a breach of the contract by one or any of the other members; that it is a matter of such delicacy as the casting of question upon the honor of a man or the chastity of a woman; that these contracts are of such importance that the common law furnishes no adequate protection; and that if there be a breach of this contractual scheme by anyone, the effectiveness of a whole institution would fall like a house of cards.

In order that there might be no doubt of the importance of this contract being fully complied with, they saw fit in section 17 to incorporate this language in the marketing agreement, ''All parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all of the growers to each and all of the said contracts.''

This principle, while not expressed in exactly this language, is recognized in our court in *Brown* v. *Staple Cotton Ass'n,* 132 Miss. 859, and in the following cases from other states: *Kan. Wheat Growers' Ass'n* v. *Schulte,* 216 Pac. 311; *Haarparinne* v. *Butter Hill Fruit Growers' Ass'n,* 119 Atl. 116; *Minn. Wheat Growers' Co-Op. Marketing Ass'n* v. *Huggins,* 203 N. W. 420 at 426; *Potter* v. *Dark Tobacco Growers' Ass'n,* 257 S. W. 33; *Dark Tobacco Growers' Ass'n* v. *Dunn,* 266 S. W. 308; *Tobacco Growers' Ass'n* v. *Jones,* 117 S. E. 174.

It is held in all of these cases that for one man to fail to send his product into the association is a breach of the contract, which strikes at the root of the matter itself, and destroys the true worth of this association.

The question naturally presents itself, the true worth to whom? The answer seems to us evident. To the members of the association. If a failure by Borodofsky to deliver one hundred and twenty-five bales of cotton is to be construed as the contract itself construed it, and as the court construed it, as an attack upon and a weakening of the foundation of the entire superstructure and as destroying the true worth of this association to the other members thereof, how much more is the act of the association in releasing fourteen thousand bales, or more, of cotton a death blow to any benefit to Borodofsky, as a member of the association?

The association by the terms of section 3 thereof agreed to buy all of this cotton. In consideration of which agreement, Borodofsky agreed to deliver his. The association then agreed with other members that it would release their cotton. Appellant argues that this was an agreement made with the grantee of the members and not with the member himself. That is a gossamer too thin to conceal the true figure beneath.

Had the association not have entered into this agreement, then the association would have had a right to proceed against such other members who breached the contract, and have recovered ten cents per pound for each pound of cotton not delivered. Ten cents per pound per bale would be fifty dollars. On fourteen thousand bales it would have been seven hundred thousand dollars, which the association could have recovered. Borodofsky as a member of the association would have been entitled to his *pro rata* share of this, but the association by the execution of these releases has estopped itself from proceeding to collect such liquidated damages. We submit that this is contrary to the underlying purpose and agreement of the whole association itself, contrary to the letter of section 3 of the contract itself, contrary to the spirit of the contract as set out in section 17, contrary to the purpose of the organization, as such purpose has been declared by every court before whom a similar case

has been, and has been expressly held by the court of
New Jersey to be a breach of the contract. See *New
Jersey Poultry Producers' Ass'n* v. *Tradelius*, 126 Atl.
538.

We submit that there can be no serious contention in
view of the above authorities, that the release of the cot-
ton was a breach of the contract by the association.

III.   We come to the final question for consideration,
which is whether in view of the kind of breach of which
the association was guilty, Borodofsky was entitled to
the affirmative relief of rescission and cancellation.

Counsel cites authorities and discusses the proposi-
tion that if Borodofsky had himself breached his con-
tract, he was not entitled to a rescission. We want here
and now to assent to that. He says that Borodofsky con-
strued the contract for himself and concluded that the
share of the cotton belonging to his tenants was not sub-
ject to the contract. We also assent to this, but we say
further that when he did  so conclude, he concluded
clearly and correctly. The court in passing upon this
question agreed with him.

A good deal is said about the necessity of our showing
an irreparable injury. Certainly, counsel suggests no
remedy that Borodofsky has at law that will recompense
him when he is bound by a contract the true value of
which to him has been wholly destroyed by the breach
of the other party thereto.

It is a well recognized principle that if such contract
of ours has been breached by the other party, we are
entitled to have a decree removing such cloud or if we
are in danger of being subjected to pestiferous rents
on account thereof, we are entitled once and for all to
be relieved of it. It is also a well established fact that
when a court of equity has once assumed jurisdiction,
it will retain jurisdiction so as to do full, adequate jus-
tice to the extent of cancelling contract.

We have found no co-operative association case in point, but the principle is announced most strongly in *Gress* v. *Village Fort Loramie,* 125 N. E. 112. The Mississippi court in *Hannah* v. *Mortimer,* 82 Miss. 645, has very concisely stated the circumstances under which equity will grant a rescission of an executory contract, or of one partially executed and partially executory, to which case we refer. See, also, *Bare* v. *Victoria Coal & Coke Co.,* 80 S. E. 940.

We further submit that the decree of the court in granting rescission and cancellation was right, and this case in all things should be affirmed.

Argued orally by *R. C. McBee,* for appellant, and *A. W. Shands,* for appellee.

McGOWEN, J., delivered the opinion of the court.

The Staple Cotton Co-operative Association, appellant, filed a bill in the chancery court of Bolivar county against the defendant, J. S. Borodofsky, in which the cotton association charged that the defendant in 1921 had entered into a co-operative agreement with the other members of the association by which the said Borodofsky agreed to deliver all the cotton raised on his place by him, for him, or in which he had an interest, setting out the various sections of the co-operative agreement which will be further adverted to in this opinion. The bill further alleged that Borodofsky had breached his marketing agreement by the selling of approximately one hundred bales of cotton, and by failing and refusing to deliver that amount of cotton to the association under the agreement. The bill prayed for a decree of specific performance, that the defendant be required to deliver the cotton to the association under the marketing agreement, and for an injunction to enforce the contract and to prevent a breach thereof further; for a discovery as to what amount of cotton had been grown, produced, and acquired

by or for him in the year 1924; what cotton he had on hand, what cotton he had sold; and that a commissioner be appointed to make and state an account showing the indebtedness of the defendant to the association at the rate of ten cents per pound for all cotton produced, controlled, or in any way owned by the appellee, Borodofsky, and not delivered to the association; for costs and attorneys' fees; and that the defendant be enjoined from breaching in any manner the said contract.

To this bill the defendant filed his answer denying liability under the marketing agreement, denying that he had any cotton subject to the agreement, and setting up that he rented land for a cash consideration and had only a landlord's lien on cotton produced by his renters which was discharged by the payment of the rent; that he farms part of his land by what is known as share tenants, some of whom pay one-fourth of the cotton produced, others pay one-half, and that the balance of the cotton so raised belongs to the tenants; and that he had delivered the cotton which he had received in kind as rent for his premises under his contract with his tenants.

The proof showed that Borodofsky took trust deeds on his tenants' lands for their "furnish," meaning the supplies used by the tenant in producing the crop, food for himself, and for his stock. It was the contention of the appellant, the association, that these trust deeds from these tenants in most cases covered the entire value of all the crop of the tenant, and that by this trust deed Borodofsky acquired an interest in and to the cotton raised, and that Borodofsky's contract with his tenant that he might sell his own cotton and pay the money on his supply account to Borodofsky, and the association in effect contends that this was a subterfuge; that Borodofsky was really entitled to the cotton and that he owned one hundred per cent of it; that he had both a trust deed and a landlord's lien for the supplies furnished.

574    Cotton Co-op. Ass'n v. Borodofsky. [Sup. Ct.

Opinion of the Court.                    [143 Miss.

Borodofsky further contended, and the chancellor found, that in all cases where rent was payable in kind or in cotton, Borodofsky had complied with his marketing agreement, and the chancellor was perhaps warranted in so finding. Borodofsky further showed by his proof that in preceding years he had handled by purchase at the market value, or above, the cotton of his tenants, and had turned the same over to the association, but that by this proceeding he found he had lost about thirty dollars a bale, and so at the beginning of the year 1924 he specially contracted with each of his tenants that the tenants might sell their part of the cotton, receive checks therefor, and bring the checks to Borodofsky and get credit therefor on their accounts. In other words, prior to 1924, Borodofsky had delivered all the cotton grown on his place to the association, and for the year 1924, when this controversy arose, he changed his contract with his tenants without notifying his tenants of the fact that he belonged to the association or had made the marketing agreement which is the basis of this controversy.

The chancellor found for the defendant, Borodofsky, dismissing complainant's bill, holding that Borodofsky had delivered all of the cotton which he was obligated to deliver under his marketing agreement, and that he was not under legal duty to deliver the cotton of his tenant other than his share received in kind where cotton rent was to be paid.

It will be seen that this involves a construction of the contract and the right of the tenant and the right of the landlord, and whether or not by the marketing agreement Borodofsky had agreed that he would deliver his tenants' cotton to the association. The chancellor held in the negative. But in view of the fact that we have reached a conclusion upon the cross-bill filed by Borodofsky against the association seeking a cancellation of the entire contract which settles this litigation, we pretermit a discussion of the very interesting question presented

by the bill, answer, and proof in this case, for if the chancellor was correct in canceling the entire contract upon the facts alleged in the cross-bill, then of course no right could be predicated thereon such as is set up in the original bill.

In the cross-bill Borodofsky charged that the cotton association had in the year 1924, at planting time or before, materially breached its contract, in that many thousand bales of cotton had been released from the operation of the marketing agreement by the directors of the association, which association was incorporated under the laws of the state of Tennessee and authorized to do business in Mississippi; that the said release of members, by the release of their cotton, from the operation of the terms of their contracts, to cotton brokers and banks to be sold on the outside, was antagonistic to the true intent and spirit of the co-operative corporation, and not only was it a breach of the contract, but that such breach operated to defeat the purpose of the organization; that the damages could not be ascertained, and that he was without adequate remedy other than by a cancellation of the contract; and he prayed for a cancellation of the marketing agreement, and the court below canceled the contract.

We set out the following sections of the marketing agreement which may be involved and may shed light upon the questions to be decided in this case.

"Section 2. The association agrees to buy and the grower agrees to sell and deliver to the association all of the cotton produced or acquired by or for him during the years 1920, 1921, 1922, 1923, and 1924.

"Section 3. The grower expressly warrants that he has not heretofore contracted to sell, market or deliver any of his said cotton to any person, firm or corporation, except as noted at the end of this agreement. Any cotton covered by such existing contracts or crop mortgage shall be excluded from the terms hereof for the period and to the extent noted."

"Section 11. The grower shall have the right to stop growing cotton and to grow anything else at any time at his free discretion; but if he produces, or acquires or owns any interest in any cotton, during the term hereof, it shall be included under the terms of this agreement and must be sold only to the association."

"Section 13. This agreement shall be binding upon the grower as long as he produces cotton directly or indirectly, or has the legal right to exercise control of any commercial cotton or any interest therein during the term of this contract."

Briefly stated, the proof showed, issue being joined thereon by the association, that the association had executed releases to its members of this cotton covered by the mutual marketing agreement; the release being to prospective creditors of the member, copy of one of which is here set forth *in extenso*:

"Agreement.

"Whereas, ————, a member of the Staple Cotton Cooperative Association is desirous of obtaining advances and loans of money from the ———— bank of ————, during the year 1922, to be secured by a recorded trust deed on growing crops or cotton in bales produced by said member during the said year.

"Now then in consideration of the making of said loans and advances by the said bank, and in order to induce the said bank to make the same, it is hereby covenated and agreed with the said bank that nothing in the marketing agreement of this association with said member shall be construed to preclude said member from giving such trust deed on his growing crop or cotton in bales so as to secure the payment of any loan or advance hereafter made by said bank during said year, and said marketing agreement shall in no way affect any such trust deed in favor of said bank.

"This agreement shall not be construed to release the member from his said marketing agreement, if the

said bank shall not furnish money to the said member during said year and shall fail to take and record its deed on the growing crop or cotton in bales, of said member in such year or if such member shall at any time during such year pay off and discharge the indebtedness secured by such trust deed to the said bank, then this agreement shall automatically cease and be of no effect.

"Witness the signature of the Staple Cotton Co-operative Association by its president, this the ———— day of ————, 1922.

"Staple Cotton Co-operative Association,
"Per ———————, President.
"Attest: ——————."

The association thereby released the cotton to be raised by members of its directorate and other members of the association to the extent of about fourteen thousand bales of cotton raised by them. At least three directors were released by an instrument similar to the one set out above and many of its prominent members. The officers stated that not all of its cotton that was released was lost to the association, but that some came back to the association but not under the terms of the agreement. The amount of the cotton thus coming back to it is not shown in this record. The release was signed by the president on the authority of the board of directors and was for the purpose, as stated by Mr. Bledsoe, of permitting the grower members of the association to produce cotton because the banks and brokers would not furnish supplies necessary to make the crops without this or a similar release; that these members could not raise a crop at all if they could not have money to purchase supplies with which to feed the teams and tenants and to procure the necessities for making the crop of cotton. The court below canceled the contract in this state of the case, and we have reached the conclusion, after a very careful study of this record, that we must reluctantly assent to the correctness of the chancellor's finding.

Counsel for appellant insist that the form of release was not of the member but of the cotton. We may assent to that proposition, but the very warp and woof of the instruction is cotton—staple cotton—and a release of some because of their necessities in order that they might raise cotton, which cotton would not go into the pool of the association but which would necessarily be handled by the brokers and purchasers in the open market to the detriment of the very purpose of the association to sell cotton at advantageous prices unaffected by the brokers and intermediate dealers. So that when it is conceded that the cotton was released, necessarily there was a breach of a serious nature of the contract which materially affected Borodofsky, because the courts have uniformly held that where these associations are formed for the purpose of marketing the product, these mutual agreements were of material benefit to the association and to each member thereof, and that the penalty prescribed would be enforced.

This view is sustained in part by section 17 as follows:

"All parties agreeing that this contract is one of a series dependent upon its true value for the adherence of each and all of the growers to each and all of the said contracts."

This contract was upheld as not violating the Constitution in *Brown* v. *Staple Cotton Co-operative Association,* 132 Miss. 859, 96 So. 849, wherein this court held that this association created a sales agency for the mutual benefit of its members. So that any way that this contract is viewed its main object and purpose was to handle as a sales agency in pools the product of cotton of its members as set forth in the contract, and unquestionably there was a breach of the contract in thus releasing about fourteen thousand bales of cotton from its operation to be handled by those who were presumably antagonistic to the spirit and purpose of this organization, all of which occurred before Borodofsky is alleged to have breached his contract.

To sustain our position that this is the dominant feature of this contract we quote as follows:

In *Kansas Wheat Growers' Ass'n* v. *Schulte,* 113 Kan. 672, 684, 216 P. 311, at page 317, the court said:

"This association was organized for the sole purpose of marketing the wheat raised by its members, and performing such functions as are incidental thereto. From the very nature of things it must have the wheat or it cannot exist. It has no power to buy wheat; hence it cannot go into the open market and purchase wheat to fill its contracts of sale, if the members fail to deliver, and thus sustain its existence or recoup its loss. Even the payment of damages of twenty-five cents per bushel stipulated to be paid by a member for each bushel he produces and sells elsewhere would not sustain the association and enable it to do the business for which it is incorporated. Hence, as a practical matter, it is of little consequence that the member is solvent and able to respond in damages. If the association received damages from all, or a substantial portion, of its members, it would cease as a going concern, or be so seriously handicapped as to destroy its usefulness. Wheat is the only commodity the association can use as a going concern. All it can do with money is to pay its expenses and disburse the balance among its members. It necessarily follows that there is no adequate remedy at law. The only adequate remedy is injunction, preventing the member from selling to others, and thus forcing the delivery of the wheat to the association. *Washington Cranberry Growers' Ass'n* v. *Moore,* 117 Wash. 430, 201 P. 773, 204 P. 811 [25 A. L. R. 1077]; *Phez Co.* v. *Salem Fruit Union,* 103 Or. 514, 201 P. 222, 205 P. 970 [25 A. L. R. 1090]; *Owen County Burley Tobacco Society* v. *Brumback,* 128 Ky. 137, 107 S. W. 710."

In the case of *Haarparinne* v. *Butter Hill Fruit Growers' Ass'n,* 122 Me. 138, 141, 119 A. 116, at page 117, near the bottom of the first column, the court said:

"It is clearly apparent, however, that if the plaintiff could sell to 'outside parties' every member could do the same, and that would mean the end of the association as an effective agency. Hence the whole scheme of the corporation depends upon not a legal but an honorable observance of that item. We are unable to discern any interpretation of section 9 that points to the association as a purchaser, or a member thereof as a vendor thereto.''

In the case of *Minnesota Wheat Growers' Co-operative Marketing Association* v. *Huggins,* 162 Minn. 471, 485, 203 N. W. 420, at page 426, the court said:

"The parties have thus provided for liquidated damages, but does that damage give the plaintiff a full, complete, and adequate remedy? It does not. Plaintiff is entitled to equitable redress. It is, as stated, a co-operative marketing association, conducted without profit, limited exclusively to its members. Each member has similar contract relations with it. Each depends upon the other. Its success depends entirely upon the performance by the members. It must, to carry out its purposes, make contracts for the disposal of the products acquired by the membership contracts. In making such contracts of disposal, as well as contracts for necessary instrumentalities needed in conducting its business, it must know that it will get the products contracted for. From the very nature of the association it must have the wheat, or it cannot exist. Wheat is the only commodity it can use as a going concern. It does not have power to go into the market and buy it. It must have this information in advance and prepare for the future. It must arrange for help, capital, and perhaps storage. If one or more members may disregard their contracts with impunity and a loss occurs, there is no way to meet such loss, and if it may be said to be a loss that must be met by the members who remain, then it is obvious that few persons would join or remain members. The consequence would be so serious to plaintiff that the remedy at law is wholly inadequate, nor can it be said that the

March, 1926] Cotton Co-op. Ass'n v. Borodofsky. 581

143 Miss.]                    Opinion. of the Court.

legal remedy is either full or complete. The only adequate remedy is an injunction preventing the members from breaching their contracts, and thus forcing the delivery of the wheat to the association. The members' breach of such a contract is so fraught with consequences to both the association and the individual members thereof that equity cheerfully puts out its restraining hand, with the admonition that the member under such circumstances must not violate the covenants he has voluntarily assumed. He is not compelled to grow wheat, but as long as he produces within the period of the contract he must not sell to anyone but plaintiff, and he is thus indirectly or negatively required to perform the obligation of his contract."

In the case of *Potter* v. *Dark Tobacco Growers' Cooperative Ass'n,* 201 Ky. 441, 448, 257 S. W. 33, at page 36, the court said:

"Appellee has no capital stock, is not operated for profit, and is not permitted to buy, handle, or sell tobacco except for its members, but is dependent for its existence and an opportunity to serve its members upon their observance of their contracts. It would be utterly impossible to ascertain the damage that would result to the co-operative effort from a breach of their like contracts by one or more members, and it was both wise and provident, if not essential for attainment of their purposes, that they agree on a basis for estimating same, and the legislature, in recognition of that fact, expressly authorized them so to do, although that right clearly existed without such express authority. Nor do we regard, and certainly we cannot say, in the absence of proof, that five cents a pound is unjust or oppressive, or out of all proportion to the damages which would result from such a breach. Hence the sum so fixed must be construed as liquidated damages, rather than a penalty, and is collectible. *Walton, etc.,* v. *McKitrick,* 141 Ky. 415, 132 S. W. 1046; *Fiscal Court of Franklin County* v. *Public Service Co.,* 181 Ky. 245, 204 S. W. 77."

582    Cotton Co-op. Ass'n v. Borodofsky. [Sup. Ct.

Opinion of the Court.        [143 Miss.

And in the case of *Dark Tobacco Growers' Co-operative Ass'n* v. *Dunn,* 150 Tenn. 614, 630, 266 S. W. 308, at page 312, the court said:

"The basis of the decisions is obvious. The complainant could not do business without tobacco. When it contracts to sell, it must fill its contracts with tobacco delivered by its members. It cannot replace defendant's tobacco by purchasing upon the open market. Its charter prohibits it from so doing. For each pound of tobacco which is not delivered to the association by a member, there is a *pro rata* increase in the operating costs of the association; and that increase cannot be estimated in terms of money with definite exactness. For every defection of one member, there is a certain amount of dissatisfaction engendered among other members; indeed, other members are encouraged not to deliver their tobacco, and the normal increase of the association's members is prevented. All these things result in damage, but the amount of damage cannot possibly be computed."

In the case of *Tobacco Growers' Co-operative Ass'n* v. *Jones,* 185 N. C. 265, 277, 117 S. E. 174, at page 180 (33 A. L. R. 231) the court said:

"They [the producers] are forcing no one to join, and they are exacting no inordinate prices for their product. They are associating themselves as authorized by the statute, like other persons, and they have signed mutual and fair agreements among themselves, which will be futile unless those who have signed such agreements can be held to abide by the terms of their contracts."

Counsel for appellant insist that, as this is a mutual contract between all of the members therof, before the contract can be canceled all necessary parties must be in court. In other words, he insists that the hundreds of members of this duly chartered corporation must be made parties.

It will be borne in mind that each grower who signed the contract became entitled to be a stockholder in the corporation and entitled to one vote therein, and vested the power usually incident to the directors of other corporations in their directors, which seems to answer the question raised by counsel that having sought the jurisdiction of equity to enforce its contract, equity retains its jurisdiction to administer full relief to the parties, and we think this objection is without merit.

As we do not consider that there is any merit in the contention that because Borodofsky had delivered all of the cotton raised on his place by himself and by his tenants in the preceding years, he was thereby estopped to assert a right to cancel his contract. This is answered by the fact that, according to the record and proof, Borodofsky did not know of the release of the fourteen thousand bales of cotton until after this litigation was well under way, and until after at least two branches of it had been appealed to the supreme court, when he learned, it is said, for the first time, of these releases and filed his cross-bill immediately upon learning of the breach. So that there could be no estoppel so far as this record discloses.

In the case of *New Jersey Poultry Producers' Ass'n v. Tradelius,* 96 N. J. 683, 126 A. 538, where an association similar to this for the marketing of eggs which contemplated that the eggs were to be sold by the association through consumers, and the association saw fit to disregard this provision and to sell to or through brokers and retain more than two cents per dozen eggs for operating the association, also failed to candle the eggs, the court released or discharged the complainant from the obligation of his contract.

This record shows that three per cent is retained by the corporation on the cotton sales for payment of expenses, and the profit over is to be paid to each of the members of the association, and the proof shows that about one and one-half per cent. is necessary for operat-

ing expenses, so that there is direct damage shown in the depletion of this fund created for the benefit of the stockholders. But because of this release ten cents a pound was not collected on fourteen thousand bales of cotton, which would amount to about fifty dollars per bale penalty, or one hundred thousand dollars, which would have gone to the benefit of the stockholders of the association if the law had been enforced upon these favored released cotton growers in the same manner as sought to be enforced upon Borodofsky.

There are instances where these releases were made in favor of cotton brokers, and all releases were to the end that more cotton might be produced, which would be handled in a manner antagonistic to the spirit of this marketing contract, and if it be said that these directors were animated by a spirit of humanitarianism, this spirit could not be exercised to the detriment of all of the other cotton growers, members of the association, who were forced to abide by the contract. It was not to the interest of the members of this association under its express purpose as outlined in its entire agreement, as construed by practically all the courts of this country, to have outsiders raise cotton, or to have cotton raised which was not controlled by and under the direction of the directors of this Staple Cotton Co-operative Association, and every bale of cotton raised and sold by these members, by virtue of these releases, or similar ones, was antagonistic to the spirit of the business in which this association was engaged, and tended to thwart the purpose of the association to have all the cotton grown sold through this one agency, and tended to have placed in the hands of the brokers and outside dealers about fourteen thousand bales of cotton out of a possible one hundred twenty-five thousand bales of cotton controlled by this association.

The value of this contract to each of the members thereof depended upon the other members adhering to it, and we must say that this release by the directorate of other

March, 1926]   Cotton Co-op. Ass'n *v.* Borodofsky.   585

143 Miss.]                          Syllabus.

directors, giving to them the right to sell their cotton on the outside in so far as they could incumber it to the people to whom it was released, was such a breach of the contract as released Borodofsky from adhering to it. Any other view would be unreasonable, there being no compensation or benefit to the association. To say that Borodofsky, whom the record shows had mortgaged his cotton without the consent of the directors of the association, should pay to the association fifty dollars a bale for one hundred bales of cotton, and that Scott, a director, and Perry, a director, and the others, could mortgage their cotton to Crittenden & Co., cotton brokers, and be released from the penalty, would be unfair, however pure the motive animating the directors. We think Borodofsky was released.

*Affirmed.*