MISSISSIPPI MILK PRODUCERS ASSOCIATION *v.* McINNIS, et al.

No. 43048 May 11, 1964 163 So. 2d 668

*McIntyre & McIntyre,* Brandon, for appellant.

*Harold B. Cubley,* Hattiesburg, for appellees.

McElroy, J.

Lanelle C. McInnis and thirteen others filed a bill of complaint against the Mississippi Milk Producers Association and the Borden Company, both corporations, seeking an injunction to prohibit Mississippi Milk Producers Association, herein called appellant, from interfering with the appellees and the Borden Company in connection with the shipment by appellees of milk by an independent hauler to the Borden Company plant at Biloxi, Mississippi, and to cancel contracts between the appellees and appellant.

Injunction was issued without notice on February 2, 1962. Thereafter answer and cross-bill was filed by appellant and the cause was heard in March. The case was taken under advisement and final decree was entered in June 1962, making the injunction against appellant, Mississippi Milk Producers Association, permant, and dismissing appellant's cross-bill.

Prior to July and August 1961 the appellees were members of appellant association, each having signed a member contract upon the payment of $2 membership fee and whereby each of appellees agreed to be governed by the articles of incorporation and bylaws of the association (appellant), and authorized a deduction be taken from the milk sales as a membership checkoff ''not to exceed 10¢ per cwt.'' Each of the appellees thus agreed in the membership contract to market all Grade A marketable fluid milk and dairy products through the appellant and to deliver or have delivered all of the milk or dairy products in such manner and form and at such points as appellant shall direct. The contract further provided as follows:

''I, the signatory hereto, hereby appoint the Association as my sole agent for the purpose of receiving, handling, selling, transporting, weighing and testing of said milk or dairy products, and give to the Association the power to establish a base or quota plan to pool and to co-mingle same and authorize the Association to take and possess title to all or any part of said milk or dairy products.

''The Association agrees to handle each and every producer's milk or dairy products in the most profitable manner possible, to oversee testing and weighing and payments for milk and shall use every care in the interest of the producers.

''The Association agrees that the Producer shall have the right to cease producing milk, or move from the area under the jurisdiction of the Association at his or her discretion; but if he or she produce any milk or cream, or acquire an interest in any milk or cream produced for the market under the jurisdiction of the Association during the term of this agreement, it shall be included under the terms set forth in this agreement.

''This agreement to be for the term of one (1) year from the date hereof and automatically hereafter for

successive periods of one (1) year therefrom, unless cancelled by either party hereto, by written notice given during the month of January effective the last day of the following month.''

The appellant, Mississippi Milk Producers Association, is a co-operative marketing association incorporated under the laws of the State of Mississippi. It is also an AAL association under the laws of Mississippi and a qualified association under the Kappa-Volstadt Act, and is qualified to do marketing services under the Agricultural Marketing Act of 1937, and under the federal and state marketing orders of the State of Mississippi. The area where appellees live and produce milk as dairy farmers is the Gulf Coast marketing area. The marketing services appellant renders to its members for 10¢ per cwt. of milk checkoff includes checking weights, testing members' milk, reporting marketing information, furnishing a market for members' milk not needed at the primary market, finding primary markets for the producers' milk, and diverting milk from the primary market to other markets when necessary. The Association provides hauling services, sales services, tank, pipeline, supplies, and it organizes and establishes hauling routes and determines the proper amount the producer should pay in order to get his milk to the market, depending on the length of the route, size of equipment, number of producers on the route, and the distance to the market.

It is a characteristic of the milk production and marketing business that in winter when milk is in the smallest supply, demand for Grade A fluid milk is greatest, and in spring and summer when milk is in greatest supply, the demand is smaller. Consequently, it is necessary in the marketing of milk to divert the excess milk not needed in the fluid milk market where the price is approximately $5.46 per cwt. to the cheese plants and condenseries; the federal price for which was in the

spring of 1961 $3.20 per cwt. Prior to about May 15, 1961 appellant had certain arrangements with cheese plants, powder milk plants and others who would pay a 20¢ premium per cwt. on milk that was not needed in the Gulf Coast marketing area. While it cost the association more to haul the milk to plants in Tennessee, Alabama and other places, it absorbed those temporary losses incurred in hauling the milk the considerable distances involved by applying the 20¢ premium it got above the federal $3.20. About May 15 the purchasers of this milk not needed in the fluid milk market at such plants as the Borden Plant in Biloxi let it be known they would not pay the 20¢ premium on Grade 2 milk diverted from the primary market as stated, because of declining business in the cheese and other markets using Grade 2 milk.

Milk classed as Grade A or Class 1 is reclassified to Class 2 when it is diverted from the primary fluid milk market to cheese plants, powder milk plants, and other such users of milk products.

The appellant continued to absorb these losses by paying to the milk producers in the Gulf Coast marketing area the federal price of $3.20 per cwt. and absorbing the hauling costs at a loss to appellant of about $3,000 to $4,000. After about a month of such losses and it appeared that the difficulties brought about by the refusal of the purchasers of Class 2 milk to pay the 20¢ premium was not temporary but permanent, the association had the choice, according to its manager, of requesting a federal order reducing the prices on Class 2 milk or "taking over the payroll" and absorbing appellant's losses on the Class 2 milk transported outside the primary market area and absorb those losses by reblending the price "1 to 2¢ per cwt." The appellant's board of directors decided to reblend the prices until the following January, and they were of the opinion that this would be to the best interest of all the producers of milk and would save the producers consider-

able money. The association thought it had the authority to do this under the bylaws of the association. "Taking over the payroll" meant that the payment for all milk would be received by the association and the association would then pay its members, rather than have the members paid by the purchasers of the milk.

A series of meetings was had among the membership of appellant, and apparently the membership at large agreed with this method of handling the Class 2 milk sales. This new plan was put into effect for the July 1961 milk payments. At one of these meetings where apparently the majority of appellees were present, one of the employees of appellant, apparently meeting with some considerable resistance to the new method of marketing the milk, told those present that while he did not think it was right, the market administrator (apparently meaning federal market administrator) in the past had approved changing the name of the operation of the dairy or producer from a membership to a non-membership, and stated words to the effect that the only way the producers could avoid taking over the payroll by the association and making further reductions from their milk payments was to change the name of the dairy.

The chancellor found, and he was justified in so doing, that this statement justified appellees in changing the name of their dairies to either their wives or children. At any rate, they did make changes in their health department permits, and entered into a contract with an independent hauler to haul the milk produced by them to the Borden Company plant at Biloxi, Mississippi. After that, the association notified them, the new operators if there were new operators, that the association would not haul their milk any longer unless a 10¢ hauling charge was paid in addition to that paid by members of the association. In other words, appellant thereupon treated the appellees as non-members, and

refused to haul their milk as members. It was then that appellees entered into an independent hauling contract, which continued until about February 2, 1962.

Sometime in the fall of 1961, the federal market administrator, or some federal officer, entered an order that the transfer of appellees' businesses to wives or children would not be recognized, and in effect attempted to order the appellees back into the association.

The development that precipitated this lawsuit, filed on February 2, 1962, resulted from the following circumstances: On or about January 30 the Board of Directors of appellant sent its secretary-manager to the Borden Company plant at Biloxi with instructions that if some solution to the "undesirable atmosphere" in the relationship between the Borden Company and appellant could not be worked out, not later than February 1 (two days later), that would lead to a full supply arrangement whereby appellant would supply the Borden Company at Biloxi with all of its milk needs, appellant would discontinue delivering milk of its producers to the Borden plant. This resulted in the Borden plant refusing to accept milk from the appellees, and their milk had to be taken to Franklinton, Louisiana at considerable loss to appellees. This precipitated appellees' application for an injunction.

It is the contention of the appellees that the injunction was justified because (1) appellant breached the membership contract with appellees by refusing to haul their milk on or about August 1, 1961; (2) appellant breached the contract by refusing to allow the Borden Company to purchase appellees' milk; and (3) appellant breached the contract when it received and kept the 20¢ premium on Class 2 fluid milk sold to cheese plants and other users of Class 2 milk.

■■ ■ We are of the opinion and hold that the chancellor was justified in finding that appellees were advised by an employee of the association that they could

change the name of their operation to their wives or children and thereby become non-members, and that they did so in the belief they had no further obligations to appellant. ██ This is further corroborated by the fact that appellant did in fact notify appellees the association would not haul their milk without payment of a premium of 10¢ per cwt. over that paid by members of the association and sent each a contract so providing. Under the circumstances, the appellant is in no position to deny that the appellees were non-members of the association. Staple Cotton Co-op. Assn. v. Borodofsky, 143 Miss. 558, 108 So. 802.

 ██ We hold the appellees were justified in withdrawing from the association for the reasons given, and that the association had no further rights in the marketing of milk of appellees and did not have title to their milk. ██ Furthermore, the chancellor was justified in finding that appellant unlawfully interfered with the marketing and hauling arrangements between appellees and the Borden Company, and caused refusal of the Borden Company to receive appellees' milk after the visit of appellant's manager on January 30, 1962.

For the reasons stated, we are of the opinion the decree making the injunction permanent should be and is hereby affirmed.

Affirmed.

*Lee, C. J., and Ethridge, Gillespie and Brady, JJ.,* concur.